RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0295p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RONALD POST,

  *Petitioner-Appellant,*

  *v.*

MARGARET BRADSHAW, Warden,

  *Respondent-Appellee.*

No. 03-4085

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 97-01640—Lesley Brooks Wells, District Judge.

Argued: June 15, 2010

Decided and Filed: September 13, 2010

Before: BATCHELDER, Chief Judge; SILER and COLE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Rachel Troutman, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Holly E. LeClair, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Rachel Troutman, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, Joseph E. Wilhelm, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Holly E. LeClair, Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

  BATCHELDER, C.J., delivered the opinion of the court, in which SILER, J., joined. COLE, J. (pp. 30-38), delivered a separate dissenting opinion.

---

**OPINION**

---

ALICE M. BATCHELDER, Chief Judge.  Ronald Post, an Ohio death-row inmate, appeals from the district court's denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  For the reasons that follow, we affirm the district court's denial of the petition for a writ of habeas corpus.

**I.**

During the early morning hours of December 15, 1983, Post robbed an Elyria, Ohio, hotel and murdered the clerk on duty, Helen Vantz.  *State v. Post*, 513 N.E.2d 754, 756 (Ohio 1987).  He subsequently admitted his involvement in the crimes to numerous persons,[1] including two Elyria police detectives and a fellow prisoner, Richard Slusher.  *Id.*  Several of these people had had no involvement in the crimes or their planning.  *See id.*

Post was indicted by a Lorain County, Ohio, grand jury on April 17, 1984, on one count of aggravated robbery with a firearm specification (count one), and two counts of aggravated murder, each with two specifications:  a firearm specification, and a specification that Post was the principal offender in an aggravated robbery that led to the

---

[1]Through oral argument in this case, it was believed that one of the individuals to whom Post had confessed was a police informant named David Thacker.  The transcripts of conversations between Post and Thacker, however, had never been made part of the record, either in state court proceedings or in Post's habeas proceedings.  On June 2, 2010, Post filed a motion in the district court to expand the record to include those transcripts.  Our docket, however, does not reflect any attempt by Post to notify this court of the motion filed in the district court.

On August 13, 2010, the district court granted Post's motion and expanded the record to include the transcripts, which do not include an express confession of the murder by Post to Thacker, but do detail Post's participation in the crimes, generally.  In expanding the record, the district court misapplied Fed. R. App. P. 10(e), which is intended to allow the appellate record to be corrected to accurately reflect the record considered by the district court, not to introduce new evidence which was not before the district court.  *United States v. Barrow*, 118 F.3d 482, 487-88 (6th Cir. 1997).  Even if the contents of the transcripts were material to the issues on appeal, therefore, it would be inappropriate for us to consider them.  However, our review of the transcripts makes it clear that they are also completely immaterial, and we mention them only to note that we do not base our decision here on any alleged confession by Post to Thacker.

murder, and that he committed the murder with prior calculation and design (counts two and three). *Id.* at 756-57. He pleaded not guilty.

Before trial, Post's counsel retained polygraph examiner Robert M. Holmok as a defense expert. In addition to his polygraph examination business, Holmok was a detective for the Lakewood Police Department, in an adjacent county. On May 21, 1984, Holmok interviewed Post in the Lorain County jail, while preparing to give him a polygraph test. No one else was present. During this interview, Post confessed to the robbery and murder, and signed a statement: "The following statement is only to be given to my attorney Ernie Hume & is not to be admitted in court against me. I did the robbery of the Slumber Inn & shot the clerk, Helen."

The prosecutor called Holmok some time after this interview and asked if Post had confessed, but Holmok refused to divulge that information. On July 16, 1984, the State added Holmok to its witness list.

On July 29, 1984, a jailhouse informant, Richard Slusher, wrote the prosecution that on that day, Post had confessed to Slusher his involvement in the murder. While Slusher's letter details Post's confession, it contains no reference to Holmok.

The State subpoenaed Holmok to appear before the grand jury on August 1, 1984, and ordered him to bring all documents relating to interviews he had with Post. Post moved to quash, and the State withdrew the subpoena, instead filing a motion in limine to determine whether Holmok could testify regarding his pre-polygraph interview with Post. Post moved to exclude Holmok's testimony.

At a pre-trial hearing on the matter, the State called Slusher as a witness; Slusher testified that: (1) Post told him in August that he had signed a written confession for Holmok; and (2) Post had admitted to Slusher that the confession was true. On November 29, 1984, the trial court ruled that the written confession and Holmok's testimony were admissible because Post's disclosure to Slusher waived any attorney-client privilege.

The following day, a plea hearing was held. Earlier, the State had offered Post a plea agreement in which, in return for his plea of guilty, Post would be given a life sentence. His counsel, in light of the evidence that Post had confessed to several different individuals, had urged him to accept that deal, but Post had refused to plead guilty. *State v. Post*, 1997 WL 10141, at *1-2 (Ohio Ct. App. Jan. 3, 1997) (unpublished). At the plea hearing, Post waived his right to a jury trial, agreed to proceed before a three-judge panel, and changed his plea to no contest, pursuant to an agreement with the State that he would be permitted to change his previously submitted motion in limine — to prevent the prosecution from using the Holmok evidence — to a motion to suppress. *Post*, 513 N.E.2d at 757. Post's counsel hoped that, inasmuch as there were no statutory mitigating factors Post could present to the court, the court might at least consider the no contest plea in mitigation.

At the beginning of the hearing before a three-judge panel, the State noted its intention to present a statement of facts to establish the elements of the offenses, after Post's plea had been accepted. Defense counsel, who had previously read the prosecutor's statement of facts, said that it omitted the fact that the court had ruled Holmok's testimony admissible. Defense counsel objected to the omission, describing it as "a crucial element involved in the entering of the plea," and "evidence which we intend to take up on appeal." The prosecutor responded that he did not intend to include the Holmok confession in his statement of facts. The court made no specific ruling on the objection.

The court, after interviewing Post to determine whether his plea was knowing, intelligent, and voluntary, accepted the no-contest plea. The prosecutor then read the statement of facts to which Post's counsel again objected, reiterating their view of the importance of the Holmok confession. The court found Post guilty on all counts.

On March 12, 1985, the three-judge panel heard evidence of the aggravating and mitigating factors and imposed sentence. The panel found that the State had proved one aggravating circumstance, that Post was the principal offender and had committed a murder while committing an aggravated robbery and in possession of a firearm. It

considered Post's no-contest plea and found that it failed as an act of contrition. Finding that there were no other mitigating circumstances, the court imposed the death sentence. It also imposed a 10 - 25 year sentence for the aggravated robbery offense and a three year sentence for the firearm specification. *Post*, 513 N.E.2d at 757. The conviction and sentence were left undisturbed by direct appeal and state post-conviction proceedings.

In 1997, Post sought federal habeas relief, raising thirteen claims: (1) his counsel rendered ineffective assistance in the guilt phase; (2) his counsel's ineffectiveness rendered his no-contest plea involuntary; (3) an invalid jury waiver rendered the no-contest plea involuntary; (4) someone on the defense team leaked privileged information to the State, thus violating Post's rights to due process, fair trial, and the effective assistance of counsel; (5) the State's use of a jailhouse informant to elicit incriminating statements from Post violated his right to counsel, in violation of *Massiah v. United States*, 377 U.S. 201 (1964); (6) the State failed to disclose favorable evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (7) his counsel were ineffective in the penalty phase; (8) his counsel were ineffective for failing to prepare an adequate social history for the psychological expert to use in evaluating Post; (9) the trial court improperly admitted victim-impact statements in the penalty phase; (10) due to various errors, the trial court's sentencing determination was improper; (11) the trial court erred in failing to hear evidence to determine whether the charged aggravator existed; (12) Ohio's capital scheme is unconstitutional on its face and as applied; and (13) the Ohio appellate courts failed to perform a meaningful proportionality review. The district court denied the habeas petition and dismissed it with prejudice, but granted a certificate of appealability ("COA") on seven claims, namely claims 1, 2, 5, 7, 9, 10, and 11. Post timely appealed, asking this court to expand the COA to include claims 4 and 6, and moved this court to remand the case to the district court for resolution of some discovery issues. We denied the motion, *Post v. Bradshaw*, 422 F.3d 419 (6th Cir. 2005), but the Warden withdrew her opposition to Post's motion to expand the COA and asked this court to set a briefing schedule on the issues certified by the district court and on those that Post had asked this court to include in the COA. This court set a briefing schedule, thus impliedly granting the motion to expand the COA to include claims 4 and 6.

**II.**

We review a district court's denial of a petition for writ of habeas corpus de novo. *Tolliver v. Sheets*, 594 F.3d 900, 915 (6th Cir. 2010). But because Post filed his federal petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the AEDPA standards govern. *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Under AEDPA, a writ may not be granted unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. 28 U.S.C. § 2254(d)(1)-(2). Factual determinations made by the state courts are presumed to be correct unless rebutted by clear and convincing evidence. *Id.* at § 2254(e)(1).

In analyzing whether the state court decision is contrary to, or an unreasonable application of, clearly established Supreme Court precedent, we may look only to the holdings of the Supreme Court, not the dicta. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "A state court renders an adjudication 'contrary to' federal law when it 'arrives at a conclusion opposite to that reached by the Supreme Court on a question of law' or 'decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Biros v. Bagley*, 422 F.3d 379, 386 (6th Cir. 2005) (quoting *Williams*, 529 U.S. at 412-13) (internal brackets omitted). We may grant habeas relief under the unreasonable application clause if the state court decision (1) identifies the correct governing legal principle from the Supreme Court decision but unreasonably applies it to the facts; or (2) unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Williams*, 529 U.S. at 407-08. In order to violate the unreasonable application clause, the state court application of Supreme Court precedent must have been more than simply erroneous or incorrect; it must have been "objectively unreasonable." *Id.* at 409-11.

This AEDPA analysis does not apply to claims that the state court resolved without deciding the federal constitutional issues on the merits, as such claims are held to be procedurally barred.  Instead, if we reach the merits of such claims, we review them under pre-AEDPA law.  *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).

## III.

On appeal, Post has renumbered his claims and blended two claims.  However, for the sake of consistency, we will adhere to the district court's numbering system.  Further, Post has failed to brief claim 10, thus abandoning it.  *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998) ("Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal.").  He merges claim 9, that the trial court erred in admitting victim-impact statements, with claim 7, that his counsel were ineffective because they placed the victim-impact evidence before the court.  Accordingly, we will address this matter as we address claim 7.

## A.

### *Ineffective Assistance of Counsel*

In Claims 1, 2, and 7, Post argues that his trial counsel was ineffective at various stages of the proceedings.  To establish the ineffectiveness of trial counsel, Post must demonstrate that (1) his counsel's performance was deficient, that is, objectively unreasonable under prevailing professional norms, and (2) it prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  "The burden is on the defendant to make such a showing by identifying the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," *Phillips v. Bradshaw*, 607 F.3d 199, 209 (6th Cir. 2010) (internal quotation marks omitted), and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689.  The test for prejudice is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.  *Id.* at 694.  Finally, if the defendant does not demonstrate that his counsel's performance was deficient, we do not

need to consider the issue of prejudice.  Similarly, if the defendant cannot establish prejudice, we need not consider whether counsel's performance was deficient.  *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2264 (2010) ("To establish ineffective assistance of counsel, a defendant 'must show both deficient performance and prejudice.'"  (internal citations omitted)).

In the guilt phase, when a defendant pleads no contest, the result to be analyzed is whether it is reasonably probable that, absent the error, the defendant "would have insisted on going to trial."  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

**1.**

*Claim 1:  Counsel Rendered Ineffective Assistance of Counsel in the Guilt Phase*

Post argues that his trial counsel rendered ineffective assistance in the guilt phase when they: (1) failed to employ an independent polygraphist, rather than Holmok, who was allegedly conducting polygraphs for the Elyria Police Department on the case; (2) permitted Post to enter a no contest plea without a commitment from the trial judges that this would prevent a sentence of death; (3) permitted Post to plead no contest without gaining any concession for the plea; and (4) failed to adequately preserve the no-contest plea by allowing the State's statement of facts to omit the statement of Post to Holmok.  Post has organized these deficiencies into two categories: ineffectiveness regarding Holmok, and ineffectiveness in advising that Post plead no contest.

**a. Holmok**

Post first argues that his trial counsel were ineffective in hiring Holmok as part of the defense team because (1) they knew he was a police officer; (2) they knew he had an ongoing conflict with one of Post's trial counsel stemming from an unrelated case in which Holmok — in his capacity as a police officer — had obtained a confession from the defendant by unethical means, *see State v. Luck*, 472 N.E.2d 1097, 1102-03 (Ohio 1984); and (3) they knew the prosecutor had contacted Holmok to ask him to give polygraph tests to two of the witnesses against Post.  The first two arguments were not advanced in the district court, and thus we may not consider them.  *See Brown v.*

*Marshall*, 704 F.2d 333, 334 (6th Cir. 1983) ("appellate courts do not consider issues not presented to the district court."). However, the third argument — that counsel were ineffective in hiring Holmok because they knew that he had a conflict of interest due to his being asked to work for the State in the same case — was raised by Post below. During post-conviction proceedings, the Ohio Court of Appeals found that this portion of the claim was barred by res judicata because it could have been raised on direct appeal. *State v. Post*, 1997 WL 10141, at *2 n.1, *4-5 (Ohio Ct. App. Jan. 3, 1997) (unpublished). During federal habeas proceedings, the district court held that this portion of the claim was not defaulted, because the state procedural rule in question was not firmly established at the relevant time and was therefore inadequate to bar federal review. *See Combs v. Coyle*, 205 F.3d 269, 276-77 (6th Cir. 2000). The Warden believes that the district court erred in this respect. Regardless of the merit of the Warden's procedural default arguments, we conclude that Post's substantive argument has no merit, even if we review it de novo. He has failed to establish that Holmok agreed to — or did — conduct polygraph tests for the State in this case, as opposed to merely being asked to do so. Post therefore fails to establish any conflict of interest on Holmok's part that would have made it professionally unreasonable of trial counsel to use his services.

Post next argues that counsel were ineffective in failing to adequately preserve the Holmok issue for appeal. However, the argument on this issue, as Post has presented it on appeal, has significantly changed from the argument Post presented to the district court. Before the district court, Post contended that counsel were ineffective because they allowed the State's statement of facts to omit Post's statement to Holmok. Of course, Post's counsel had no control over how the prosecutor chose to draft his statement of facts, and beyond objecting to that statement — as Post's counsel certainly did — it is wholly unclear "what more defense counsel could or should have done." On appeal, however, Post's argument has morphed into a totally different creature. He now argues that, "[a]s soon as counsel realized that the statement of facts omitted reference to Holmok, counsel should have advised Post against entering his no contest plea." Post Br. at 34. The assignment of error has thus shifted from counsel's failure to control the

prosecutor's choice of facts to counsel's failure to give Post the proper advice in response to the prosecutor's statement of facts. While this surely is a better argument, it is not the one advanced in the district court, and we may not consider it.[2] *See Brown*, 704 F.2d at 334.

### b. Ineffectiveness in Advising the No Contest Plea

Post also argues that counsel were ineffective because they advised him to plead no contest but failed to secure any benefit for him in return. He specifically refers to the American Bar Association's guidelines for capital-defense counsel, presumably arguing that counsel were ineffective for failing to follow them. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("1989 ABA Guidelines") 11.6.2 cmt. (1989) (stating that "counsel should insist that no plea to an offense for which the death penalty can be imposed will be considered without a written guarantee, binding on the court or other final sentencer, that death will not be imposed.") (internal quotation marks omitted). On direct appeal, the Ohio Supreme Court addressed this claim on the merits, and held that Post's counsel's strategy was professionally reasonable. *See Post*, 513 N.E.2d at 762-63 (citing *Strickland*, 466 U.S. at 689). And when Post again raised this subclaim in post-conviction proceedings, the trial court and the court of appeals held that res judicata barred the subclaim. *Post*, 1997 WL 10141, at *2 n.1, *4-5.

The claim is properly before us. *See Cone v. Bell*, 129 S. Ct. 1769, 1781 (2009) ("When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review"). And AEDPA's unreasonable-application clause controls the analysis, because the Ohio Supreme Court relied on *Strickland* in holding that it was professionally reasonable for Post's counsel to recommend a no-contest plea. The Ohio Supreme Court pointed to the hopelessness of Post's proceeding to trial, noting that "defense counsel was faced with overwhelming

---

[2]Even if we were to consider this new argument, it would fail. As we explain later, there was a reasonable strategy in maintaining the no-contest plea, namely the hope that it would be considered a mitigator at sentencing and give Post a chance at avoiding the death penalty.

evidence of guilt, including several confessions," and that a no-contest plea benefitted Post by "preserv[ing], for appellate review, the trial court's ruling on the motion in limine." *Post*, 513 N.E.2d at 762-63.

In basing its holding only on these two grounds, however, the Ohio Supreme Court unreasonably applied *Strickland*. Neither of the two rationales the court relied on establishes that Post obtained any benefit from pleading no contest, and hence, that counsel's recommendation that he enter that plea was the result of reasonable professional judgment. The first — that Post was virtually certain to be found guilty if he proceeded to trial — is no doubt true, but treats a trial and a no-contest plea as equivalent, and ignores one of the *detriments* resulting from a no-contest plea: Post's loss of the constitutional right to have his case decided by trial. And by focusing exclusively on a guilt-phase issue (the inevitability of conviction), the Ohio Supreme Court ignored a far more important question (at least under the circumstances of *this* case): in the *penalty* phase, was Post more likely to be sentenced to death by three judges or twelve jurors? Hence, this rationale cannot, by itself, establish that counsel's performance was objectively reasonable.

The second rationale — that pleading no contest was part of a strategy designed to preserve the Holmok issue for appeal — establishes no benefit to Post either. The post-conviction attorney expert for Post identified a major flaw in that reasoning:

> Petitioner did not receive any concession from the State of Ohio when counsel for the Petitioner was permitted to re-title its pretrial motion to exclude the testimony of the polygraph examiner from a "Motion in Limine" to a "Motion to Suppress[."] If Petitioner had gone to trial, he would have *still had the same appellate issue as long as counsel objected to the testimony during the actual trial*.

Thus, any benefit from the ability to re-title the pre-trial motion was illusory if the State would have sought to use the Holmok evidence had Post gone to trial. Of course, the State might not have used it, in which case the issue would indeed have been lost. But in that case, Post would have gained exactly what his "strategy" allegedly sought: exclusion of the Holmok evidence.

This raises an even more fundamental point.  Preservation of the Holmok issue gained Post nothing; if on appeal Post had succeeded in having the Holmok evidence excluded, he would have obtained no constitutionally cognizable benefit.  Rather, he would have been right back where he started, facing the same three difficult choices:  a virtually hopeless guilt phase trial, a no contest plea, or a guilty plea.

The rationales cited by the Ohio Supreme Court do not support a finding that counsel's advice that Post plead no contest was objectively reasonable.  The court identified the correct governing legal principle from *Strickland*, but unreasonably applied it to the facts.  The analysis therefore was objectively unreasonable, and we must review this subclaim de novo.  *Cf. Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006) (de novo review applies if the state court violated the contrary-to clause).

But Post's claim of ineffective assistance of counsel with regard to the no-contest plea does not survive de novo review.  The Ohio Supreme Court did not address the third rationale of Post's counsel for advising that plea, namely the hope that the plea would be considered a mitigating factor.  *See Post*, 1997 WL 10141, at *2.  Because Post refused to plead guilty, despite the State's offer of a life sentence in return for a guilty plea, this strategy was professionally reasonable.  Post would be convicted, but he would almost certainly have been convicted if he had gone to trial.  By pleading no contest, he would "avoid[] the ordeal" of a guilt phase and have his sentence "determined *without the sentencing court hearing all of the adverse testimony that would be produced at trial*."  ABA Standards for Criminal Justice 4-6.1 cmt. (2d ed. 1980) ("The Defense Function") (emphasis added).  And this way, he would perhaps have another mitigating factor arguing against imposition of the death penalty.  Even if the three judges on the panel found the no contest plea non-mitigating (as they in fact did), Post would be no worse off in the mitigation phase, at least with regard to the evidence presented to the panel.

Of course, with a no-contest plea, Post would be sentenced by judges, not jurors, and by three persons rather than twelve.  Ohio requires unanimous death sentences.

Ohio Rev. Code § 2929.03(D)(2)-(3). Hence, by pleading no contest, Post was giving up nine voters, any one of whom could prevent a death sentence.

But counsel's professional judgment is strongly presumed to have been reasonable, and it is the defendant who must overcome that presumption. *Strickland*, 466 U.S. at 689-90. Here, Post's mitigation evidence was weak. *See Post*, 513 N.E.2d at 767-68 (mentioning his then age (24); his lack of juvenile convictions; his unsworn statement asking for forgiveness; testimony from relatives indicating he was a follower, not a leader, and was a loving, non-violent person and caring father with sickly children who needed him; and a psychological evaluation determining that he was a marginally adjusted man who coped with life's problems ineffectively and who lacked maturity and sound judgment). Counsel, meanwhile, presumably knew their local juries and their probable reaction to evidence of the death of Helen Vantz. Even without any victim-impact evidence, Vantz was an extremely sympathetic victim: an unarmed woman, at work alone in the middle of the night, killed ten days before Christmas. These may be nonstatutory aggravators, but they are still legitimate considerations when evaluating counsel's strategy. *See Strickland*, 466 U.S. at 695, 699. Indeed, any trial counsel who did *not* consider them would likely have his professional judgment questioned. After consideration of all the circumstances, we think that counsel's determination that Post stood a better chance with three less emotional judges than he did with 12 jurors was professionally reasonable. At the very least, Post has not overcome the presumption that it was.

Post argues that trial counsel did not have a reasonable strategy. He points out that, sometime before he pleaded no contest, one of his counsel — Lynette McGough — informally polled the three judges. And according to her testimony at the post-conviction hearing, she did recall one of the three judges indicating that, because of his religion, consideration of a death sentence would require a moral struggle. Nonetheless, she came away convinced that he — and, indeed, all of the judges — would be able to impose the death penalty. Post Br. at 24, 29. Post argues that under these circumstances, counsel's performance in recommending a no-contest plea "knowing he would receive

nothing for it," was deficient. *Id.* at 30. But as Post concedes, while attorney McGough did not know whether the third judge would consider a no-contest plea mitigating, she did know that he had religious reservations about the death penalty. And her co-counsel, Michael Duff, after hearing her summary of the conversation with the third judge, did not think that judge would vote for death. Considering Ohio's requirement that the sentence be unanimous, Post's refusal to plead guilty, and the difficulties to be reasonably expected at trial (in both phases), a no-contest plea was a reasonable tactic.

Finally, Post points to the 1989 ABA Guidelines that indicate it is per se ineffective assistance of counsel to plead no contest without a guarantee of a life sentence. But ABA Guidelines are not "inexorable commands"; rather, they are "'only guides' to what reasonableness means, not its definition." *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009) (quoting *Strickland*, 466 U.S. at 688) (internal quotations omitted). As the *Strickland* Court explained, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* at 688-89. Post's counsel were between a rock and a hard place in determining the best way to spare him a death sentence, given the overwhelming evidence of his guilt, his numerous confessions, and his refusal to plead guilty. Counsel's strategy was professionally reasonable under the circumstances.

Post argues that he is at least entitled to an evidentiary hearing regarding whether he received the effective assistance of counsel during the trial phase. We review for abuse of discretion the district court's decision to deny an evidentiary hearing. *Vroman v. Brigano*, 346 F.3d 598, 606 (6th Cir. 2003). Under AEDPA,

> (e)(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim, unless the applicant shows that-
>
> > (A) the claim relies on --

> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e). If the petitioner has not failed to develop the factual basis of a claim in state court, the federal court may hold a hearing if the petitioner's factual allegations, if proved, would entitle him to relief. *Id.* The district court did not abuse its discretion in denying an evidentiary hearing. First, the state post-conviction court held an evidentiary hearing that encompassed much of what Post has argued here. Further, Post does not give any indication of what evidence he would offer if given a new evidentiary hearing, and the factual allegations he presents, even if proven, would not entitle him to relief.

**2.**

### Claim 2: Ineffective Assistance of Counsel Rendered Plea Involuntary

In the district court, Post argued that counsel's ineffectiveness rendered his no contest plea involuntary. For the most part, in developing his argument below, Post contended that: (1) his counsel promised him a life sentence if he pleaded no contest; (2) his counsel confused him by arguing between themselves over the type of plea to be entered, and thus rendered his plea unknowing and unintelligent; and (3) he pleaded no contest based upon his counsel's advice that the Holmok issue was a strong issue on appeal. Post combined this claim with claim 1 on appeal. *See* Post Br. at 22 - 37. His appellate brief, however, deals almost entirely with claim 1. Indeed, he has abandoned the first argument on appeal, thus waiving it. And while his brief alludes to the second argument, it makes no attempt to develop it. Post has therefore waived this argument as

well. *See United States v. Sandridge,* 385 F.3d 1032, 1035 (6th Cir. 2004) (an appellate brief that gives mere cursory treatment of certain claims, forfeits appeal of those claims). The third argument was dealt with under claim 1, and is meritless for all of the reasons previously articulated. And because Post has articulated no factual allegations that, if proven, would entitle him to relief on this claim, he is not entitled to an evidentiary hearing on it.

**3.**

### Claim 7: Counsel Rendered Ineffective Assistance of Counsel in the Penalty Phase

Post also argues that his counsel were ineffective in the penalty phase of the proceedings because they placed victim-impact evidence and other prejudicial information before the court via the presentence investigation report ("PSR") and a statement from the victim's son. He contends that counsel requested a PSR for sentencing purposes because they failed to conduct an independent mitigation investigation. He also contends that counsel requested the victim impact statement out of ignorance of Ohio's capital sentencing statutes. *See* Ohio Rev. Code §§ 2929.03(D)(1), 2929.12, 2947.051 (victim impact statements are not required).

When reviewing this claim on direct appeal, the Ohio Supreme Court focused solely on counsel's performance, found it constitutionally adequate, and therefore did not discuss prejudice. *See Post*, 513 N.E.2d at 762-63. The district court held that this claim was meritless. The Warden contends that counsel's performance was neither deficient nor prejudicial.

Post argues that we should review this claim de novo. But even if we do, the claim fails. Post has simply suffered no prejudice. He cites two categories of evidence allowed in by trial counsel that allegedly harmed him: victim-impact evidence (almost all of his briefing of the claim is devoted to this) and other prejudicial information (alluded to in one paragraph of the brief). *See* Post Br. at 75.

No prejudice could flow from the allegedly improper victim impact evidence. Any error was cured when the Ohio Supreme Court, without considering the victim-

impact evidence, independently reweighed the aggravating and mitigating factors and affirmed the sentence of death. *See Post*, 513 N.E.2d at 767-68; *Clemons v. Mississippi*, 494 U.S. 738, 748-50 (1990). It is therefore not reasonably probable that the result of the proceedings would have been different had counsel prevented the evidence from being considered by the three-judge panel.

Post also argues that because of the misdemeanors listed in the PSR, the trial panel did not assign mitigating weight to his lack of a felony record. But as the Warden suggests, the prosecutor would have had access to Post's criminal record and so could have introduced this rebuttal evidence even without the PSR. *See* Appellee's Br. at 66-67. Post argues that the prosecutor obtained from the PSR the majority of his material for his cross-examination of Post's common-law wife. Post does not specify the information he refers to, but does cite two pages of the transcript where the prosecutor asks Mrs. Post if she knew that Post had admitted using illegal drugs during the last several years and that, while living with her, he had earned extra money as a middle man for drug sellers and users. It is not reasonably probable that the absence of this information would have changed the outcome of the penalty phase.

Finally, Post argues that admission of the PSR allowed the prosecutor to make these comments in his penalty-phase closing argument: Post had "not been an upstanding citizen of the community. He's caused problems, never held a steady job. You have all that before you in the presentence report, which is part of the consideration for the sentence." Appellee's Br. at 75. To the extent this is an allusion to Post's misdemeanor convictions, it is not dependent on the PSR; the prosecutor could have presented this information without the PSR. To the extent this is arguably an attempt to rely on non-statutory aggravators, any error was cured through appellate reweighing. *See Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006) (citing *Clemons*). And any other harm that might have resulted from those comments is clearly not enough to constitute prejudice under *Strickland*.

While he does not separately brief claim 9 on appeal, Post argued more specifically below that his rights were violated by the improper admission of victim

impact statements at mitigation.  He contended that the admission of the statements was unconstitutional under *Booth v. Maryland*, 482 U.S. 496 (1987) (holding that the Constitution prohibits a jury from considering victim impact statements during the sentencing phase of a capital murder trial).  The Ohio Supreme Court rejected this claim on the merits on direct review.  *Post*, 513 N.E.2d at 758-59.  It determined that Post suffered no prejudice, as there is a presumption that judges will consider only relevant, material, and competent evidence during sentencing, and that there was no indication that the three judge panel was influenced by the victim impact evidence.  Further, it analyzed the *Booth* case, and found that there was no federal constitutional violation, as there was a significant difference between *Booth* and Post's case, namely that *Booth* involved presenting victim impact evidence to a jury, not three judges.  *Id.* at 759.  The district court affirmed this analysis, recognizing that the Ohio Supreme Court applied the correct case law, and finding that this distinction was not an unreasonable application of *Booth*.

While we agree that the Ohio Supreme Court reasonably applied *Booth*, we need not go as far here.  That is because in *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court overruled *Booth*, holding that "the Eighth Amendment erects no *per se* bar" to "the admission of victim impact evidence and prosecutorial argument on that subject."  *Id.* at 827.  Because *Payne* does not favor criminal defendants, it applies to Post, even though it was issued after his convictions and sentences became final, *see Gilmore v. Taylor*, 508 U.S. 333, 341-42 (1993); *Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor, J., concurring) ("the court making the prejudice determination may not consider the effect of an objection it knows to be wholly meritless under current governing law, even if the objection might have been considered meritorious at the time of its omission.").  Post's original claim 9 therefore fails as a matter of law.

## B.

### *Claim 4:  Leak of Privileged Information*

Post complains that his rights to due process, a fair trial, and the effective assistance of counsel were violated when the confession he made to Holmok was somehow allegedly leaked to the prosecution by a member of his defense team.  He argues that Holmok's testimony regarding the confession involved communications protected by attorney-client privilege, and the trial court erred in ruling that testimony admissible.  And he argues that this prejudiced him by causing him to change his plea to no contest because this evidence was more damaging to his case than any other incriminating statement — the confession was signed, in writing, and Holmok made a much more credible witness than Slusher or others.

Post first raised this claim in his post-conviction petition, but the trial court held that the claim had been raised and decided on direct appeal[3], and was therefore barred by res judicata.  In the alternative, the trial court held it meritless.  The Ohio Court of Appeals affirmed the res judicata holding.  *Post*, 1997 WL 10141, at *4-5.  In habeas proceedings, the district court held the claim meritless.  The Warden does not argue procedural default, instead relying on lack of merit.

Despite the previous holdings of the state courts, we believe the claim has been preserved.  When, as here, a state court declines to review the merits of a claim on the grounds that it has done so already, no procedural bar to habeas review is raised.  *Cone*, 129 S. Ct. at 1781.  AEDPA deference governs our analysis of this claim, regardless of whether we are discussing the alternative holding of the trial court on the merits, *see Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008), or reviewing the holding that

---

[3]On direct appeal, Post argued a slightly different source of error, though it is certainly related. There, he argued that the State's use of his confession to Holmok violated "his attorney-client privilege, right against self-incrimination, right to effective assistance of counsel, right to meaningful access to the courts, and due process." *Post*, 513 N.E.2d at 759.  The Ohio Supreme Court held that he had waived attorney-client privilege, and thus the trial court did not commit error in ruling the confession admissible. *Id.* at 761.  In post-conviction proceedings, as well as here, Post argues that there was somehow a leak of the confession to the State, and that the leak is the source of error.

the Ohio Supreme Court made on direct appeal when reviewing a very similar claim. *See* 28 U.S.C. § 2254(d).

In holding that, in the alternative, this particular claim was meritless, the state post-conviction trial court relied almost wholly on the Ohio Supreme Court's analysis on direct appeal.  The Ohio Supreme Court found the claim meritless because:  (1) Post waived his attorney-client privilege with respect to the confession when he revealed it to Slusher; and (2) the State did not rely on the Holmok evidence in its statement of the facts, and "the statement of facts revealed that appellant confessed to several persons that he murdered Vantz" and he "made no objection to the inclusion of these admissions in the record nor did he contest the verity of those statements."  *Post*, 513 N.E.2d at 761.  The Ohio Supreme Court also found that he was not prejudiced by the disclosure.[4]  This holding, if it survives scrutiny, defeats Post's claim because, even assuming that Post's allegations that a defense team member leaked information are true, there was no prejudice, as Post forfeited his right to confidentiality in the matter.

Post attacks the Ohio Supreme Court's holding in two ways.  First, he speculates that Slusher was lying when he testified at the pretrial hearing that Post had told him about the confession to Holmok, and that, in fact, a defense team leak was the source of the information.  *See* Post Br. at 83 ("Slusher's testimony did not account for the details the State knew about Holmok's interview with Post.").  While counsel argues this idea vigorously, Post has presented no evidence to support it; this sort of mere speculation is not sufficient to demonstrate that it was unreasonable for the trial court to believe Slusher's version of events.  *See* 28 U.S.C. § 2254(e)(1) (factual determinations made by the state courts are presumed to be correct unless rebutted by clear and convincing evidence).

Second, Post argues that the Ohio Supreme Court legally erred in holding that Post's "disclosure to a third party of communications made pursuant to the attorney-client privilege breaches the confidentiality underlying the privilege, and constitutes a

---

[4]Because this holding was based upon state law, we review it under AEDPA's contrary-to clause. *See Early v. Packer*, 537 U.S. 3, 8 (2002).

waiver thereof." *Post*, 513 N.E.2d at 761. He contends that, prior to its holding in *Post*, this was not the law. He points to *Swetland v. Miles*, 130 N.E. 22 (Ohio 1920), in which the Ohio Supreme Court specified only two ways for a client to waive privilege: (1) if the client consents, or (2) if the client voluntarily testifies on the same subject. *Id.* at 23. He also argues that the Ohio Supreme Court realized its error in a later case, *State v. McDermott*, 651 N.E.2d 985 (Ohio 1995), and modified a portion of its prior holding. *See id.* at 988. Therefore, Post argues, the Ohio Supreme Court's holding in *Post* was unreasonable. This argument is without merit.

As the Ohio Supreme Court explained in *Post,* it had previously held, in *Travelers Indemnity Co. v. Cochrane*, 98 N.E.2d 840 (Ohio 1951), that attorney-client privilege was waivable by voluntary disclosure. *See id.* at 846 (privilege is "destroyed . . . by his voluntary disclosure to others of the content of the statement."). And *McDermott* did not change this analysis as it applied to Post. *See McDermott*, 651 N.E.2d at 988 (recognizing the difference between a judicially created attorney-client privilege, "where, without the presence of the attorney, the communications between [Post and Holmok], the attorney's agent, were deemed privileged," and a statutory attorney-client privilege where the communications were directly between attorney and client, which is not subject to a "judicially created waiver."). The rule announced in *McDermott* therefore would not apply to Post, even if it were retroactively applied. In any event, this is a matter of the state supreme court interpreting state law. Post has pointed to no clearly established United States Supreme Court precedent to which the Ohio Supreme Court's holding in *Post* runs contrary. Thus, even assuming that Post's allegations that a defense team member leaked information are true, there was no prejudice, because Post forfeited his right to confidentiality in the matter as a matter of state law when he disclosed the contents to Slusher.

We find that the Ohio Supreme Court correctly determined that Post's claim was without merit. Consequently, the district court did not abuse its discretion in denying an evidentiary hearing. Post has set out no factual allegations that, if proven, would entitle him to relief because the only factual allegations that he wishes to present on this

claim are in relation to whether a member of his defense team leaked privileged information, and not whether that privilege was later forfeited by Post.

## C.

### *Claim 5: Massiah Violation*

Post claims that the State's use of Slusher to elicit incriminating statements from him after his indictment violated his right to counsel. *See Massiah*, 377 U.S. at 206. He also requests an evidentiary hearing on the matter.

In state post-conviction proceedings, the Ohio Court of Appeals held that this claim was barred by res judicata. *Post*, 1997 WL 10141, at *4-5 (holding that Post had not established that the claim could not have been raised on direct appeal). The district court found this claim meritless and denied a hearing. The Warden argues that this claim is both procedurally defaulted and meritless.

While federal courts are typically barred from hearing a claim that was procedurally defaulted in state court, *see Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977), when a state erroneously relies upon its own rule of procedural default, the claim is not barred. *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005) (citing *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001)). We find that the Ohio Court of Appeals erred in raising a procedural bar to Post's claim in post-conviction proceedings.

Ohio procedural rules normally bar a defendant from raising for the first time in post-conviction proceedings a claim that he fully litigated or could have fully litigated at trial or on direct appeal. *State v. Perry*, 226 N.E.2d 104, 108-09 (Ohio 1967). If, however, the defendant "had no means of asserting the constitutional claim there asserted until his discovery, after the judgment of conviction, of the factual basis for asserting that claim[,] . . . the . . . claim . . . was not one that could have been raised . . . before the judgment of conviction, and hence could not reasonably be said to have been . . . waived." *Id.* at 107 (citing *McMullen v. Maxwell*, 209 N.E.2d 449 (Ohio 1965)).

It appears that Post could not have asserted this claim until his post-conviction discovery of evidence indicating that Slusher had an agreement with the State to elicit incriminating evidence from Post at the time of Post's jailhouse confession. While Post was certainly aware of Slusher in the pre-trial stage, he had no evidence that Slusher was acting as an agent of the State when Post confessed to him. Indeed, at the evidentiary hearing on Post's motion to suppress the Holmok evidence, Slusher testified regarding the confession, and noted that he supplied the information to the State. But he denied that he was offered any consideration from the prosecution in return, adding that it was "not [his] motive for going to the prosecutor."

It was not until after Post was convicted that his counsel learned from Michael Tully, one of Slusher's attorneys, that at the time Post confessed to him, Slusher was a government informant who was directed to elicit the information in return for the prosecution's dismissal of pending charges against Slusher. Counsel also discovered two letters — from December 1983 and January 1985 — written by prosecutors, that indicated Slusher's role as a government informant in the Post case. Post thus could not have added this evidence to the record on direct appeal, and he properly brought the claim in post-conviction proceedings. And because the state court misapplied the res judicata defense and did not decide it on the merits, the claim is not barred, and we must review it de novo. *See Maples*, 340 F.3d at 436-37.

*Massiah* held that it violates a defendant's Sixth Amendment right to counsel when the State uses at trial against a defendant, "evidence of his own incriminating words, which . . . agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206. *Massiah*'s "primary concern . . . is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). The key here, therefore, is that the techniques must be shown to have been the equivalent of direct police interrogation. There is no constitutional violation when by "happenstance [ ] the State obtains incriminating statements from the accused after the right to counsel has attached." *Id.* Thus, "a defendant does not make out a violation of [the Sixth

Amendment] simply by showing that an informant . . . reported his incriminating statements to the police." *Id.* Instead, a defendant "must demonstrate that the . . . informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.*; *see also United States v. Henry*, 447 U.S. 264, 270, 273 (1980) (holding that there is a *Massiah* violation when a government informant "deliberately used his position to secure incriminating information from [the defendant] when counsel was not present"). Post has failed to make this showing.

Post points to a July 29, 1984, letter from Slusher to the prosecution as evidence that he did more than "merely listen" to Post. He notes that the letter states that "No more than 20 minutes [ago], I finally got the complete story from Ron Post as to what happened on the night of the murder." He contends that the use of the word "finally" indicates that he must have continually sought in the past, without success, to elicit a confession from Post, but that Post was unwilling to cooperate "until he had coaxed Post along long enough to gain his trust." Post Reply Br. at 14. The language of the letter does nothing of the sort. The mere use of the word "finally" does not give us any indication of whether Slusher was only passively listening to Post or was actively asking questions and substantively conversing. In fact, the letter later says that "Post came to me and said 'Rick I'm scared, I might fire Duff tomorrow and hire Smith so I got to get my story straight . . . will you help me?'" Slusher then details Post's confession and makes no mention of asking any questions or offering any encouragement to him. Further, Slusher testified at the pre-trial hearing with regard to the confession that "I didn't initiate it. [Post] did." "He told me he had to talk. He had to get something off his mind, and he wanted my opinion." This is wholly insufficient to demonstrate that Slusher took any action designed to elicit the confession, beyond merely listening to Post.

Finally, Post points to the affidavit of Slusher's attorney, Mr. Tully, that stated that Slusher worked "as an informant in exchange for sentencing consideration" and was under direction to "intentionally elicit statements from Ronald Post about this case." He argues that this also demonstrates Slusher's role as an active informant. It is true that

this affidavit shows Slusher's role as a government informant at the time of the confession; however, it does not indicate that Slusher, in fact, *did* deliberately elicit the confession, rather than merely listening to it.

Nevertheless, Post argues that — at a minimum — he is entitled to a remand to the district court for an evidentiary hearing on this claim, because he did not have a full and fair opportunity to develop the facts of this claim in his pre-trial hearing. As we previously discussed, it is true that the facts Post needed to develop this claim were not available pre-trial. However, this does not entitle Post to an evidentiary hearing. For good cause shown, the district court has the discretion to permit discovery in a habeas proceeding, *see* 28 U.S.C. § 2254 Rule 6(a), "provided that the habeas petitioner presents specific allegations showing reason to believe that the facts, if fully developed, may lead the district court to believe that federal habeas relief is appropriate," *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001). But "[e]ven in a death penalty case, bald assertions and conclusory allegations do not provide sufficient ground . . . to require an evidentiary hearing." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (internal quotation marks omitted).

Thus, discovery allows the petitioner to find that extra evidence he still needs to prove or strengthen his case. A hearing is for the petitioner who has already amassed enough evidence to entitle him to relief, if that evidence is proven true, and who now needs a hearing to prove that his evidence will indeed withstand scrutiny. Post has not made that showing.

The full story of discovery at the district court is also telling. Post's counsel asked for and got leave in the district court to pursue discovery, but — inexplicably — they did not pursue it. *See Post*, 422 F.3d at 421. Then, after six years with no discovery on the issue (despite the district court's having specifically set a ninety-day window within which discovery was to occur), the district court finally ruled on the habeas petition, after which Post filed what he styled as a Rule 60(b) motion directed at having the opportunity to do the discovery that he had neglected to do during the previous six years. *Id.* We held that the motion was not in fact a Rule 60(b) motion, and

instead was a successive habeas petition that is prohibited by AEDPA. *Id.* at 424. Consequently, in order for Post to pursue this claim further, he would need to have not only his requested evidentiary hearing, but also the discovery that his counsel failed to pursue. And as we previously held, he has forfeited that discovery. He thus fails to meet the requirements for a hearing, and this claim will be denied.

## D.

### *Claim 6: Brady Violation*

Post argues that the State unconstitutionally failed to disclose impeachment evidence, namely that Slusher was offered consideration in exchange for his efforts to gain evidence against Post. In post-conviction proceedings, the Ohio Court of Appeals held that this claim was procedurally defaulted, and the district court held that the claim was both defaulted and meritless, and denied an evidentiary hearing. Post disagrees.

We need not address the procedural default issue, however, as the claim fails even under de novo review. "[T]he Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633 (2002). Because *Ruiz* does not favor criminal defendants, it applies to Post, even though it was issued after his convictions and sentences became final, *see Gilmore*, 508 U.S. at 341-42; *Lockhart*, 506 U.S. at 374. The claim therefore fails as a matter of law. As a result, Post's request for an evidentiary hearing is denied because, even if all of his factual allegations were proven, he would not be entitled to relief.

## E.

### *Claim 11: State Court Failed to Hear Evidence of Charged Aggravator*

Finally, Post argues that the trial court erred in accepting his no-contest plea without following the State's capital procedure requiring the prosecutor to present evidence of the charged aggravator's existence. Because the prosecutor presented no

evidence, Post contends, his conviction of the capital-murder charge is supported by constitutionally insufficient evidence. This claim is without merit.

On direct appeal, the Ohio Supreme Court agreed that, in capital cases, state law required the procedure Post described but, applying Ohio law, held that Post had agreed to the State's proffering a statement of facts in lieu of evidence and he was bound by that agreement. *Post*, 513 N.E.2d at 766-67. On habeas review, the district court expanded the record to include a new affidavit from one of Post's trial counsel, who indicates that he mistakenly believed that the prosecutor's statement of the facts would satisfy Ohio law and that Post did not waive his right to a trial de novo to determine the aggravator's existence, nor did he enter into an agreement with the State that a statement of facts could be used in place of evidence. The district court denied relief because this was a state-law issue that did not rise to the level of a due-process violation.

Post apparently believes that AEDPA's unreasonable-application clause applies to applications of *state* law. *See* Post Br. at 94-95 (not challenging the application of any Supreme Court precedent). In actuality, the Ohio Supreme Court's application of only state law means that our analysis is controlled by the contrary-to clause. And that clause was not violated because neither the result nor the reasoning of the Ohio Supreme Court opinion was contrary to clearly established Supreme Court precedent.

By pleading no contest, Post waived any objection to the sufficiency of the evidence, *see United States v. Freed*, 688 F.2d 24, 25-26 (6th Cir. 1982), so we cannot reach the merits of Post's argument that the result was contrary to clearly established Supreme Court precedent. Post's other argument fares no better. In fact, he concedes there is no constitutional requirement that the State prove the guilt of a defendant who pleads no contest. *See United States v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995) ("The requirement that a sentencing court must satisfy itself that a sufficient factual basis supports the guilty plea is not a requirement of the Constitution"); *see also Carpenter v. Edwards*, 113 F. App'x 672, 680 (6th Cir. 2004) (Merritt, J., concurring) (writing, in an Ohio guilty-plea capital case, that "the state prosecutor himself rather than sworn witnesses stated a factual basis for the entry of the plea. There is no federal

constitutional prohibition forbidding a state trial court from establishing a factual basis in this way").

To the extent there was a violation, it would have been a violation of state law, not cognizable in a habeas corpus proceeding. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984). To the extent that a petitioner claims that an alleged state-law violation raises a federal constitutional issue, we review it under the general due-process standard: whether the defendant was denied a fundamentally fair trial. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974) (holding that federal courts may only overturn convictions resulting from state trials when the alleged error "violated some right which was guaranteed to the defendant by the Fourteenth Amendment."). There is nothing fundamentally unfair about not requiring the State to prove a case that a defendant, represented by counsel, knowingly, voluntarily, and intelligently says he does not contest.

Nor was the state court's reasoning contrary to clearly established Supreme Court precedent. The Ohio Supreme Court found that "the parties agreed that the statement of facts proffered by the [S]tate would constitute the sole evidence of aggravating circumstances before the court," *Post*, 513 N.E.2d at 766, and that Post was bound by the agreement, *id.* at 767. He points to no clearly established Supreme Court precedent even implying that it is improper to hold a represented defendant to his knowingly, voluntarily, and intelligently made agreement.

Post argues that the state-court decision "constitutes an unreasonable determination of the facts and law," Post Br. at 94-95, but fails to specify which factual findings he challenges. He does not mention the trial-counsel affidavit filed in the district court, so he has abandoned any claims that might arise from that affidavit's factual allegations. *See Robinson*, 142 F.3d at 906. Regardless, the trial counsel affidavit was not presented to the Ohio Supreme Court, so the court could hardly have been unreasonable in not considering it, *see* 28 U.S.C. § 2254(d)(2). And that leaves Post debating no facts, only their significance. As a result, his challenge to "unreasonable" findings of fact collapses into his challenge to the "unreasonable"

application of law — *state* law. To the extent he attacks the Ohio Supreme Court's application of state law (in finding there could be an agreement under these facts), his argument may be viewed only through the restrictive lens of the contrary-to clause. Because Post points to no clearly established Supreme Court precedent contradicted by this application of state law, we find no error in the district court's denial of relief on this claim.

## IV.

For the foregoing reasons, we **AFFIRM** the judgment of the district court denying Post's petition for habeas relief.

---

**DISSENT**

---

COLE, Circuit Judge, dissenting.  As Ronald Post faced a possible death sentence on charges of aggravated robbery and aggravated murder, his counsel advised him to forego all of his trial rights and plead no contest, without any indication from either the prosecution or the three-judge sentencing panel that this would do anything to help spare his life.  Following his no-contest plea, and leading up to his sentencing hearing, his attorneys then failed to conduct an independent investigation into circumstances that might mitigate against the imposition of the death penalty.  Further, at the sentencing hearing itself, his counsel requested that a member of the victim's family be permitted to speak.  Because of this choice by his attorney, the last testimony heard by the three-judge panel which sentenced him to death was the victim's son discussing how his mother had been murdered just ten days before Christmas—the first Christmas she would have had off work in thirteen years—and his belief that "the only just punishment for execution is execution."  (J.A., vol. 4, at 913-14.)  Additionally, following Post's sentencing, new evidence came to light indicating that Richard Slusher—the jailhouse informant whose pretrial testimony about Post's confession loomed large over the decision not to go to trial—had intentionally elicited the confession from Post at the direction of the prosecutors, in violation of *Massiah v. United States*, 377 U.S. 201 (1964).

I respectfully dissent from the majority's opinion because I believe that Post's counsel was constitutionally infirm both in advising him to plead no-contest and at the sentencing stage.  Further, I believe we should remand to the district court to hold an evidentiary hearing on Post's *Massiah* claim.

I.

In analyzing Post's claim that he received ineffective assistance of counsel when he was advised to plead no contest, the majority concludes that the Ohio Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S. 688 (1984). The majority finds that neither justification offered by that court—that Post inevitably would have been found guilty had he gone to trial and that pleading no contest allowed him to preserve the issue regarding the admissibility of Robert Holmok's testimony—provided a constitutionally cognizable benefit. I agree with this analysis. However, reviewing the issue de novo, the majority then concludes that Post's trial counsel's advice to plead no contest was objectively reasonable because there was "hope that the plea would be considered a mitigating factor." I disagree. While I acknowledge that Post's attorneys were in an unenviable position—there was strong evidence of their client's guilt, but he had refused to plead guilty—I believe that the Constitution requires attorneys to make strategic judgments based on something more concrete than unsubstantiated hope, especially when their client's life hangs in the balance.

At the time Post pleaded no contest, he was represented by two attorneys: Michael Duff and Lynett McGough. Although both Duff and McGough initially advised Post to plead guilty, once he refused, Duff advised him to plead no contest to preserve the Holmok admissibility issue for appeal and because Duff did not think that Post would be sentenced to death if he pleaded no contest. Prior to the sentencing hearing, McGough polled the three judges sitting on the panel to see if they would consider a no-contest plea a mitigating factor and if they were opposed morally to the death penalty. Two of the judges explicitly told McGough that they would not consider a no-contest plea as a mitigating factor. The third judge indicated some moral concern about imposing the death penalty based on his religious beliefs, but McGough concluded that he, as well as the other two judges, would be willing to impose the death penalty. Based on these conversations, McGough stated that her "feeling was if we entered the no contest plea then the Judges would impose the death penalty." (J.A., vol. 4, at 995.) Therefore, she continued to advise Post to change his plea to a guilty plea even after the

no-contest plea had been entered.  In contrast, Duff advised Post to plead no contest.  As is apparent, Post followed Duff's advice and entered a no-contest plea.

I believe that Post's counsel was ineffective in advising him to plead no contest without any guarantee that it would help spare his life.  The 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (the "ABA Guidelines") advise that attorneys representing defendants facing the death penalty "should insist that no plea to an offense for which the death penalty can be imposed will be considered without a written guarantee, binding on the court or other final sentencer, that death will not be imposed."  ABA Guidelines 11.62 cmt.  Further, they recommend that "[i]f no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights," and that "counsel must strive to prevent a . . . client from pleading guilty where there is a likelihood that such a plea will result in a death sentence."  *Id.* 11.6.3 cmt.  The 2003 version of the these guidelines offer similar guidance.  *See* ABA Guidelines 10.9.2 cmt (rev. ed. 2003).  Indeed, citing the 2003 ABA Guidelines, the Supreme Court has stated:

> [P]leading guilty [to a capital offense] without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant.  Pleading guilty not only relinquishes trial rights, it increase the likelihood that the State will introduce aggressive evidence of guilt during the sentencing phase, so that the gruesome details of the crime are fresh in the jurors' minds as they deliberate on the sentence.

*Florida v. Nixon*, 543 U.S. 175, 191 n.6 (2004).[1]

---

[1] In *Nixon*, the Supreme Court held that it was not per se unreasonable for a capital defendant's counsel to concede guilt during trial without the express consent of an uncooperative defendant, in order to focus on mitigation at the penalty phase. *Nixon*, 543 U.S. at 191-92. This case differs in two important regards. First, as the Supreme Court noted, the *Nixon* defense counsel's concession strategy was not the equivalent of a guilty plea because the defendant "retained the rights accorded a defendant in a criminal trial" and by forcing the prosecution to present aggressive evidence of guilt during the guilt phase, this evidence was "separated from the penalty phase, enabling the defense to concentrate that portion of the trial on mitigating factors." *Id.* at 188. Second, the key factor undermining the *Strickland* claim in *Nixon* was that defense counsel conceded guilt as a strategic choice to help his mitigation presentation at the penalty phase. In this case, as discussed below, Post's representation at the penalty phase likewise was inadequate.

Post's attorneys undoubtedly found themselves in a difficult position. "Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. . . . In such cases, 'avoiding execution [may be] the best and only realistic result possible.'" *Id.* at 191 (quoting ABA Guidelines 10.9.1 cmt. (rev. ed. 2003)). However, I believe that the Constitution required Post's counsel to make a strategic judgments based on something more concrete than an unsubstantiated hope that his no-contest plea would be considered a mitigating factor, particularly because their client's life was on the line. Curiously, the majority opinion never explains why pleading no-contest would be considered a mitigating factor. Indeed, as the majority points out that, because death penalty verdicts must be unanimous under Ohio law, Post essentially lost nine potential "no" votes by choosing a three-judge panel over a jury. Further, there are other possible negative implications that a no-contest plea might carry. For example, the three-judge panel could have viewed Post's no-contest plea as acknowledgment from Post that he killed Vantz, but a stubborn refusal to accept responsibility for his crime.

Further, the majority provides no explanation for why the ABA Guidelines' recommendation should be disregarded. Following Supreme Court precedent, this Court specifically has held that the ABA Guidelines should be used as a guide to determining the standards of reasonable representation in death penalty cases, even in cases that predate their adoption. *See Hamblin v. Mitchell*, 354 F.3d 482, 486-88 (6th Cir. 2003); *see also Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010) (reaffirming that the ABA Guidelines should serve as guides for courts analyzing the constitutional-deficiency prong of *Strickland* claims). In this situation, the ABA Guidelines' recommendation is clear. In following their guidance we do not, as the majority seems to suggest, need to adopt them as per se rules. Rather, as both this Court and the Supreme Court has stated repeatedly, we look to them for guidance in determining whether counsel's representation was constitutionally inadequate.

"A guilty or no-contest plea involves a waiver of many substantial constitutional rights . . . ." *Fautenberry v. Mitchell*, 515 F.3d 614, 636-37 (6th Cir. 2009). Here, Post

was advised to waive those rights in exchange for nothing more than a hope that his no-contest plea would be considered mitigating.  I imagine that Post may have gained some comfort in knowing that his attorney hoped his no-contest plea would be treated as a mitigating factor.  But this comfort was short-lived.  Post's counsel's foremost duty in that situation was not to keep *hope* alive, but to keep *Post* alive.  Viewed in this light, it certainly was unreasonable to advise him to plead no contest and waive all of his trial rights without a guarantee, or at least some concrete indication, that doing so might help spare his life.

For Post to succeed on this claim he would, of course, still have to demonstrate prejudice.  Because Post's claim is based on his counsel's advice to plead no contest, "in order to satisfy the 'prejudice' requirement, [he] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Railey v. Webb*, 540 F.3d 393, 415-16 (6th Cir. 2008).  At the state post-conviction hearing, Post testified that he wanted a jury a trial and that, had he believed receiving the death penalty was a possibility, he would not have pleaded no contest.  Further, Post already had refused to plead guilty, adding more credence to the proposition that he would have insisted on going to try but for his counsel's ineffective advice to plead no contest.

## II.

Post also claims that he received ineffective assistance of counsel during the penalty phase of his state-court proceedings.  Below, the district court concluded that the Ohio Supreme Court unreasonably applied *Strickland* in rejecting this claim because Post's "[d]efense counsel did not make a strategic decision not to present certain evidence in mitigation or an informed decision not to investigate certain facts.  Instead, Mr. Duff and Ms. McGough failed to do any independent investigation into Mr. Post's background in preparation for the mitigation hearing." (Dist. Ct. Op. 143.)  Rather than conducting an independent investigation into possible mitigation evidence, Post's counsel completely relied upon a presentence investigation report prepared by the probation department.  For example, leading up to the sentencing hearing, Post's lawyers

failed to interview his family members and friends in order to obtain background information on him, failed to follow leads about potential character witnesses, and failed to obtain records and collateral information to adequately research his background. Indeed, the family witnesses who did testify on his behalf at the sentencing hearing (his mother, stepmother, and common-law wife, respectively), submitted affidavits stating that defense counsel spent only ten minutes preparing them to testify, as a group, immediately before the hearing.

Further, the district court concluded that McGough performed deficiently at the sentencing hearing itself by calling the victim's son, William Vantz, to testify when she "should have known that [the son's] statement would be damaging to her client and that Ohio law did not require [the son] to be given an opportunity to make his statement." (*Id.* at 151.)  William Vantz stated that his mother "was a caring, loving woman who would do anything for anyone.  She never hurt anyone; she would never, ever hurt anyone."  (J.A., vol. 4, at 912-13.)  He also described how his mother, who was murdered ten days before Christmas, was not scheduled to work on Christmas for the first time in her thirteen years working at the Slumber Inn and how she had plans to spend the day with her son and only grandson.  He stated further that "she was full of life. . . .  She enjoyed her life to the fullest, and for it to be taken in such a way is just inexcusable."  (*Id.* at 913.)  He concluded:

> She was executed, and I feel the only just punishment for execution is execution.  My family feels that way, my cousins, my brothers, our wives, friends of the family.
>
> We loved that woman, as did everyone that came in touch with her.  A part of my life left when she left, and that will never come back.
>
> . . . .
>
> I'm going to leave it in your hands to do what's right, what's just.  I'm not versed in the law, but yet in my heart I feel the only thing to do is to give Mr. Post what he deserves.

(*Id.* at 913-14.)

The majority concludes that despite this performance by his counsel at the penalty phase, Post's claim fails because he cannot meet *Strickland*'s prejudice requirement. *See Strickland*, 466 U.S. at 692. However, "when a client faces the prospect of being put to death unless counsel obtains and presents *something* in mitigation, minimal standards require some investigation." *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999). In *Mapes*, this Court held that the defendant had been prejudiced by his counsel's failure to conduct a mitigation investigation because even though the evidence that went unpresented during the penalty phase was, at best, "slim evidence of mitigation, . . . it [was] *something*. And what is most important, it was [the defendant's] *only* shield from a death sentence." *Id.* Post's habeas counsel has presented mitigating evidence describing the inadequate parenting he received as a child, the inappropriate and inadequate discipline he received, and his self-consciousness about being overweight, which led to abuse of diet pills. As in *Mapes*, although this certainly is not the most dramatic mitigating evidence, it is *something*. I believe that had this evidence been presented, had Post's family witnesses who did testify been adequately prepared, and had Post's counsel not called the murder victim's son as the final witness to testify, "there is a reasonable probability that . . . the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, that is, one of the three judges would have voted not to impose the death penalty.

### III.

Finally, I disagree with the majority's treatment of Post's *Massiah* claim. While Post was being held in jail pretrial, he confessed to a fellow inmate, Richard Slusher. Specifically, Post told Slusher that he previously had confessed to Robert Holmok, polygraph examiner hired by Post's attorneys, and that his confession was true. Slusher relayed this information to the prosecution. At a pretrial hearing, the trial court ruled that the attorney-client privilege did not protect Post's communications with Holmok because Post's disclosure of those communications to Slusher acted as a waiver of the privilege. Thus, Holmok could be called to testify about Post's confession at trial. The prospect of Holmok—who aside from being a polygraph examiner also was employed

as a police detective—testifying against Post appears to have played a significant factor in Post's and Post's counsel's evaluation of his likelihood of success at trial.

At the pretrial hearing, Slusher testified that he did not reveal Post's confession to prosecutors in order to gain favor in relation to his own pending cases. Further, he testified that he did not initiate the conversation with Post where Post revealed his confession to Holmok. However, evidence discovered only after this hearing undermined both of these claims. First, there are letters from prosecutors indicating that Slusher did in fact receive consideration from the State in exchange for his role in revealing Post's confession, namely, the dismissal of two charges against him and the State's decision not to oppose Slusher's request for shock probation. Second, there is an affidavit from Slusher's attorney, Michael Tully, stating that "it was determined by the Lorain County Prosecutor's Office that Richard Slusher would intentionally elicit statements from Ronald Post concerning his Aggravated Murder case." (J.A., vol. 9, at 2513.)

"Generally, a habeas petitioner is entitled to an evidentiary hearing in federal court if the petition alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing." *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001). Under *Massiah*, state agents are prohibited from intentionally eliciting confessions from suspects after they have been indicted in the absence of their counsel. *See Massiah*, 377 U.S. at 206; *see also United States v. Henry*, 447 U.S. 264, 272-75 (1980) (holding that *Massiah* applies in cases involving jailhouse informants). Thus, if Slusher actively elicited Post's confession, rather than having passively received it, Post would have a viable *Massiah* claim. Here, the evidence revealed since the pretrial hearing indicates that there is a factual dispute as to whether Slusher actively elicited Post's confession. Indeed, it is uncontested that Slusher received consideration for passing Post's confession along to the prosecution and, by way of Tully's affidavit, there is evidence that prosecutors asked him to elicit such statements from Post. Under these circumstances, I would find that the district court

abused its discretion in denying Post an evidentiary hearing to develop his *Massiah* claim further.

IV.

Based on the foregoing reasons, I dissent.