RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0291p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

ANDREW MAURICE RANDOLPH,

        *Petitioner-Appellant*,

    v.

MATT MACAULEY, Warden,

        *Respondent-Appellee*.

┐
│
│
> No. 24-1202
│
│
┘

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:21-cv-10456—Shalina D. Kumar, District Judge.

Argued: May 16, 2025

Decided and Filed: October 21, 2025

Before: THAPAR, BUSH, and MATHIS, Circuit Judges.
───────────────

## COUNSEL

**ARGUED:** Eve Brensike Primus, UNIVERSITY OF MICHIGAN, Ann Arbor, Michigan, for Appellant. Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Eve Brensike Primus, UNIVERSITY OF MICHIGAN, Ann Arbor, Michigan, Michael L. Mittlestat, STATE APPELLATE DEFENDER OFFICE, Detroit, Michigan, for Appellant. Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

    BUSH, J., delivered the opinion of the court in which THAPAR, J., concurs except for Part III.C., and MATHIS, J., concurs except for Part II.B. THAPAR (pp. 16–22) and MATHIS, (pp. 23–26), JJ., delivered separate opinions concurring in part and in the judgment.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge.   Andrew Maurice Randolph was convicted of second-degree murder and weapons charges in state court and sentenced to life in prison.  The case hinged largely on ammunition found in his father's home and a firearm found in his brother's home.  Randolph's trial counsel did not move to suppress this evidence.  In state court, Randolph contended that the failure to file the suppression motion and several other alleged deficiencies rendered trial counsel ineffective.  The state courts rejected his claims, and he now seeks federal habeas relief.

Randolph now comes before our court asserting four bases for habeas relief.  But after seeking a COA from the district court, a single judge of our court, a panel, and the en banc court Randolph comes before our court asserting four bases for habeas relief.  But after seeking a COA from the district court, a single judge of our court, a panel, and the en banc court, this court granted the COA on only one of his grounds for relief.  Despite this denial, he briefed all four issues anyway and asked us to expand the COA.

Mindful of our limited role under AEDPA, we **AFFIRM** the district court's denial of the petition because the state court's factual findings were not unreasonable, and its legal conclusions were neither contrary to nor an unreasonable application of Supreme Court precedent. We also **DENY** the motion to expand the COA because we, as a panel of this court, cannot and will not reconsider the decisions of the motions panel and the en banc court.

## I.  Background

### A.  Factual Background

In 2012, Randolph lived with his girlfriend, Kanisha Fant.  On December 9, 2012, Randolph and Fant had several arguments, and Randolph threatened Fant's family.  *People v. Randolph*, 917 N.W.2d 249, 250–51 (Mich. 2018) (*Randolph II*).  At this point, Fant decided to end the relationship with Randolph, and she told him to pack his things.  Early the next morning,

Fant and Randolph got into another argument, and Randolph struck Fant. Fant responded by grabbing a steak knife out of the drawer and ordered Randolph to leave while telling her son to call 911. Randolph then ran from the house, leaving behind all of his belongings. Police officers, Fant's mother, and the mother's fiancé (Collin Miller) arrived at Fant's home, and law enforcement began the investigation. Miller and Fant's mother then took Randolph's belongings to Randolph's father (Alphonso Taylor).

Later that night, gunfire rang out at Fant's home. Fant's mother was shot and killed. Randolph was arrested soon after.

Officers then went to Taylor's house, where Taylor consented to a search. They found firearm ammunition in Randolph's bags. Randolph was a felon, so police sought and received an arrest warrant for felon in possession of such ammunition. Randolph was arrested at his brother's house. Based on the brother's parolee status, officers searched his home pursuant to the conditions of his parole. This search found a handgun that turned out to be the murder weapon.

## B. Procedural History

After a trial in state court, a jury convicted Randolph of second-degree murder and firearms offenses. *People v. Randolph*, No. 321551, 2015 WL 7574328, at *1 (Mich. Ct. App. Nov. 24, 2015) (per curiam) (*Randolph I*). As is relevant here, Randolph contended on appeal that his trial counsel was ineffective for failing to move to suppress the gun and ammunition. Randolph argued that the motion to suppress would have succeeded because Taylor could not have consented to the search, and the police did not have a warrant to search Randolph's belongings. In Randolph's first appeal, the Michigan Court of Appeals rejected this claim without explanation. *See Randolph I*, 2015 WL 7574328, at *10. The Supreme Court of Michigan then reversed in part and remanded for unrelated reasons. *Randolph II*, 917 N.W.2d at 16. On remand, the Michigan Court of Appeals affirmed the conviction because Randolph failed to demonstrate that he subjectively held an objectively reasonable expectation of privacy. *People v. Randolph*, No. 321551, 2019 WL 286678, at *7 (Mich. Ct. App. Jan. 22, 2019) (per

curiam) (*Randolph III*).   The Supreme Court of Michigan denied leave to appeal.   *People v. Randolph*, 949 N.W.2d 714 (Mich. 2020) (*Randolph IV*).

Randolph then petitioned for a writ of habeas corpus in the Eastern District of Michigan. He claimed that his trial counsel was constitutionally ineffective for four reasons: (1) trial counsel failed to object to testimony about gunshot residue; (2) trial counsel failed to move to suppress the firearm and ammunition; (3) trial counsel failed to object to certain hearsay testimony; and (4) trial counsel failed to object to certain character evidence.

The district court denied the writ.   The district court noted that trial counsel did object to the testimony about the gunshot residue and that, in any event, trial counsel would have had valid strategic reasons for declining to object.   The district court determined that the motion to suppress the firearm and the ammunition would have failed because Randolph would not have had standing to make the objection, meaning that trial counsel's failure to file the motion to suppress was not ineffective.   As to the failure to make the hearsay objection, the district court found that the testimony would have been admissible.   Finally, the district court concluded that trial counsel's failure to object to the admissibility of the character evidence was not ineffective because trial counsel wanted to use the evidence to discredit the State's case, and that was a valid strategic decision.   The district court declined to issue a COA.

Randolph then came to this court seeking a COA.   A single judge denied the COA. Randolph next sought panel rehearing and rehearing en banc.   A panel granted rehearing in part, issuing the COA to review Randolph's claim "that trial counsel was ineffective for failing to move to suppress evidence obtained from a search of his belongings without his consent" but denying the COA "as to the other claims."   6th Cir. ECF Doc. 18 at 1.   Finally, Randolph sought rehearing en banc, which was denied.

To sum up, Randolph asked for a COA four times, and the COA was granted as to only one claim.   Despite this, in his merits briefing, Randolph now asks the merits panel to expand the COA.

## II. Scope of Review

Before we decide the merits of Randolph's case, we must determine the appropriate scope of this appeal.  Recall that Randolph asserts four grounds for relief: that trial counsel failed to (1) object to testimony about gunshot residue, (2) move to suppress the firearm and ammunition, (3) object to certain hearsay testimony, and (4) object to certain character evidence. Within the second one, Randolph asserts two theories: (1) that the searches violated Randolph's reasonable expectation of privacy, which we will call "the *Katz* theory"[1]; and (2) that the searches constituted an unreasonable trespass on his property, which we will call "the *Jones* theory."[2]    And recall that, after en banc review, our court granted the COA only on the suppression issue.

We will consider only the *Katz* theory.  Randolph failed to present the *Jones* theory to the state courts, so that claim fails for lack of exhaustion.  And because there is neither a mechanism nor a basis for expanding the COA at this point, we cannot review the remaining claims.

### A. Exhaustion of the *Jones* Theory

Federal courts cannot grant a writ of habeas corpus to a state prisoner unless "the applicant has exhausted the remedies available in" state court.  28 U.S.C. § 2254(b)(1)(A).  A claim must be "fairly presented to the state courts.  This includes a requirement that the applicant present the issue both to the state court of appeals and the state supreme court."  *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009) (cleaned up).  The prisoner "must have argued the claim's factual and legal basis at each level of the state court system."  *Whitman v. Gray*, 103 F.4th 1235, 1238 (6th Cir. 2024), *cert. denied sub nom. Whitman v. Smith*, 145 S. Ct. 1060 (2025).

We have reviewed the record in the state courts, and we do not see even a single citation to *Jones* or any discussion of that theory in the state court briefing.  We cannot say that this

---

[1]*Katz v. United States*, 389 U.S. 347 (1967).

[2]*United States v. Jones*, 565 U.S. 400 (2012).

theory was "fairly presented to the state courts" without any discussion of the theory in Randolph's state court briefing. *Wagner*, 581 F.3d at 414.

At oral argument, Randolph tried to shoehorn the *Jones* theory into this case by relying on *Miller v. Genovese*, 994 F.3d 734 (6th Cir. 2021). There, the prisoner argued that the state courts violated the Confrontation Clause by admitting a witness's testimony on direct at a prior trial while excluding the cross-examination of that same witness. *Id.* at 738–39. The State argued that, because the prisoner presented only a theory invoking the requirement in *Crawford*[3] that the defendant be allowed to cross-examine that absent witness, the prisoner could not rely on the holding of *Van Arsdall*[4] that allows a defendant to conduct the cross-examination necessary to demonstrate a witness's bias. *Id.* at 743.

But *Miller* provides no such support. The *Van Arsdall* rule is a narrower formulation of the *Crawford* rule. Put differently, if the Confrontation Clause requires that the defendant have a chance to cross-examine a witness generally, then it necessarily follows that the Confrontation Clause will require that the defendant have a chance to cross-examine a witness to determine the witness's bias. In *Miller*, then, we held that a prisoner exhausts a claim that he was denied a chance to cross-examine a witness for bias when he argues that he was denied the opportunity to cross-examine the witness at all because the former is fundamentally the same as the latter.

Here, though, the *Jones* theory and the *Katz* theory are two different and independent claims. The *Katz* theory presumes that Randolph retained his expectation of privacy when his belongings went to Taylor's house and that Taylor could not waive it for Randolph. Meanwhile, the *Jones* theory presumes that the "police physically intruded on [Randolph's] personal belongings." Appellant's Brief at 38.

Unlike in *Miller*, the claims here do not rise and fall together. We could imagine a situation where someone lacks a reasonable expectation of privacy but the government would be trespassing anyway—perhaps if a woman's handbag is left open on the floor where the officers can see into it but cannot search it without physically reaching into the bag. As a result, the

---

[3]*Crawford v. Washington*, 541 U.S. 36 (2004).

[4]*Delaware v. Van Arsdall*, 475 U.S. 673 (1986).

*Jones* theory is independent of the *Katz* theory and should have been exhausted. But the *Jones* theory was not raised in the state courts. We therefore will not consider it any further.

### B. Claims Outside the Scope of the Certificate of Appealability

We now move to the motion to expand the COA. Randolph asked for a COA four times from this court and the district court. After the district court, a single judge of this court, a motions panel from this court, and the en banc court all reviewed the application, we agreed to grant the COA on just one claim: that trial counsel was ineffective because he did not move to suppress the firearm and ammunition. We explicitly denied the COA on all other bases. Despite this, Randolph now asks the merits panel for a COA, essentially making this his fifth application for a COA. We deny the request.

We have not considered the question of whether the merits panel can expand a COA to include issues for which review has already been denied,[5] but four considerations convince us we lack that authority. *First*, neither AEDPA nor our local rules provide a mechanism for a merits panel to reconsider the denial of a COA. *Second*, the law-of-the-case doctrine precludes us from reconsidering matters already decided. *Third*, merits panels cannot question the rulings of the en banc court. *Fourth*, even circuits that would allow this maneuver would deny the motion.

We acknowledge the case law from our sister circuits suggesting that a merits panel can reconsider a motions panel's decision to deny the COA, *see Villot v. Varner*, 373 F.3d 327, 337 n.13 (3d Cir. 2004); *Olivas v. Neven*, 329 F. App'x 70, 73 (9th Cir. 2009), but we do not find it

---

[5]Randolph cites *Post v. Bradshaw*, 621 F.3d 406 (6th Cir. 2010), but it provides no support for his request. In *Post*, we denied the appellant's motion to expand the COA, but the State later withdrew its opposition, so this court deemed the motion impliedly granted. *Id.* at 412–13. That says nothing about the very different situation we have here, where the State has consistently opposed the requested expansion of the COA and this court has consistently denied it.

Nor does *Kraus v. Taylor*, relied upon by Judge Mathis, support the idea that a merits panel can expand the COA once a motions panel has denied rehearing on the merits of a COA expansion request. *See* 715 F.3d 589, 594 (6th Cir. 2013). In *Kraus*, the motions panel had denied a rehearing request to expand the COA simply because the request was untimely. *Id.* at 594. The merits panel treated the renewed request as a petition for panel rehearing of the timeliness determination, which it then granted and reconsidered the denial of the COA decision. *See id.* The case did not involve a situation where, as here, the motions panel actually ruled on the merits of the COA expansion request as the basis for its denial of rehearing. Randolph does not seek rehearing of the motions panel's timeliness ruling; he seeks yet another review of the very substantive issue raised in a rehearing petition that the motions panel denied. Specifically, this earlier panel expressly *denied* panel rehearing on the application for a COA outside of the *Katz* theory. So *Kraus* provides no support for expanding the COA, either.

persuasive for two reasons.  *First*, those cases relied on local rules that we do not have.  *Second*, AEDPA's text and structure preclude letting the merits panel expand a COA.

To start, in *Villot* and *Olivas*, the Third and Ninth Circuits relied on local rules to hold that the merits panel can expand the COA.  *See Villot*, 373 F.3d at 337 n.13 (citing 3d Cir. App. R. 22.1(b)); *Olivas*, 329 F. App'x at 73 (citing 9th Cir. R. 22-1(e)).  In the Third Circuit, "the merits panel may expand" the COA "as required in the circumstances of a particular case."  3d Cir. App. R. 22.1(b).  Meanwhile, in the Ninth Circuit, an appellant can raise issues outside the scope of the COA, and they "will be addressed by the merits panel to such extent as it deems appropriate."  9th Cir. R. 22-1(e).  Our Local Rules contain no such provision.[6]  *See* 6th Cir. R. 22.  Accordingly, there is no means for a Sixth Circuit merits panel to expand a COA.  *Cf. Bittner v. United States*, 598 U.S. 85, 94 (2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning (*expressio unius est exclusio alterius*).").

Additionally, the text of AEDPA states that a COA "shall indicate [the] specific issue or issues" that the petitioner may address on appeal.  28 U.S.C. § 2253(c)(3).  This makes clear that a merits panel may not consider issues outside the scope of the COA.  And regardless of whether § 2253(c)(3) is jurisdictional, it is still mandatory when invoked by the opposing party (as it was here).  *Gonzalez v. Thaler*, 565 U.S. 134, 146 (2012) (noting that "a timely objection" to consideration of an issue outside the scope of the COA "can[not] be ignored"); *see also Pillow v. Burton*, 852 F. App'x 986, 991 (6th Cir. 2021).  The State argued that we should not consider any matters outside the scope of the COA.  Given this objection, we must respect the guardrails around the scope of our review established by the COA approved by the motions panel.

At three levels of appellate review—by a single judge, the motions panel, and the en banc court—the conclusion was unanimous that the COA should be limited to the single search-and-

---

[6]Judge Mathis suggests that we *do* have a mechanism for expanding COAs because motions panels are not necessarily binding on us, but the only case he relies on for that proposition described two mechanisms available for reconsidering a motions panel's decision—a petition for panel rehearing or rehearing en banc.  *See Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014).  Not only did Randolph exhaust both of those options in this case, but *Wallace* actually undermines Judge Mathis's position because *Wallace* explicitly contemplates the need for a mechanism through which we could review a motions panel's decision.  And, unlike the Third and Ninth Circuits, we do not have such a mechanism.

seizure issue.  The only remaining option to expand the COA was for Randolph to seek relief from the Supreme Court.  *See Hohn v. United States*, 524 U.S. 236, 238–39 (1998); *see also* § 2253(c)(1)(A).  He did not do that, so we, as a merits panel, now cannot consider any arguments objected to by the State that are outside the scope of the COA.

AEDPA's structure reinforces our holding.[7]  At its core, AEDPA is designed to limit a state prisoner's ability to seek habeas relief from the federal courts.  That is why a prisoner must exhaust his state court remedies, § 2254(b), has only one year to file his petition, § 2244(d)(1), and generally cannot file a second petition, § 2244(b), or claim that habeas counsel was ineffective, § 2254(i).  And, most importantly for our purposes, it is why a prisoner cannot appeal the denial of a writ of habeas corpus without first seeking a COA.  § 2253(b).  If we were to conclude that a prisoner could ask the merits panel to expand the COA, then there would be little reason for the motions panel because all arguments would end up proceeding to the merits panel.  At some point, the challenges to a prisoner's conviction must come to an end.  *See Jimenez v. Quarterman*, 555 U.S. 113, 120–21 (2009) (discussing AEDPA's underlying goals of achieving finality in convictions).  One of the ways AEDPA seeks to achieve this is by forcing a prisoner seeking leave to present an argument to the court of appeals *before* merits briefing begins.  We, therefore, hold that AEDPA does not allow a prisoner to ask the merits panel to expand the COA.

Additionally, the law-of-the-case doctrine precludes the relief Randolph seeks.  "The law of the case [*sic*] doctrine provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Put another way, the law-of-the-case doctrine precludes reconsideration of issues decided at an earlier stage of the case." *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021) (cleaned up).  And a motions panel's decisions will ordinarily be the law of the case: "Later panels cannot simply choose to disregard motions-panel decisions, and if a litigant wishes to challenge a motions panel's

---

[7]It is not sufficient to argue, as does Judge Mathis, that because AEDPA does not expressly *deprive* merits panels of the ability to expand COAs, we *have* that ability.  *See* Mathis Concurrence at 24.  His logic works both ways: because AEDPA does not expressly *grant* us the authority to expand COAs, we necessarily *lack* that authority.  And if anything, we think the latter interpretation of AEDPA would most faithfully apply the Supreme Court's guidance on statutory interpretation.  *See West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022) (explaining that extraordinary grants of power must be supported by clear language).

decision on a dispositive motion, the proper course of action is to request panel rehearing or rehearing en banc." *Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014).

The issue is not whether law-of-the-case doctrine applies—it does because we are being asked to reconsider a decision from a prior stage of the case. *See, e.g.*, *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002); *Edmonds v. Smith*, 922 F.3d 737, 739 (6th Cir. 2019). The only question is whether we should disregard the law of the case for one reason or another. *See Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997). We are aware of no explanation as to why Randolph's request to expand the COA or any other would constitute one of the circumstances listed in *Hanover Insurance*.

Here, a motions panel considered whether to grant the COA. In so doing, the motions panel considered whether Randolph could "demonstrate 'that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Dennis v. Burgess*, 131 F.4th 537, 539 (6th Cir. 2025) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). Randolph now asks the merits panel for the same relief. The law-of-the-case doctrine exists because "courts generally refuse to reopen what has been decided." *Musacchio v. United States*, 577 U.S. 237, 245 (2016) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). We do not see why now should be any different. A single judge, a motions panel, and the en banc court granted the COA on a single issue and nothing else: whether trial counsel was ineffective for failing to move to suppress the firearm and ammunition. Law-of-the-case bars us from reopening that COA decision.

This is particularly true because the en banc court declined to expand the COA in this case. The en banc court sets the law of the circuit, and en banc decisions supersede panel decisions. *See, e.g.*, *Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019) (discussing how the en banc court can overrule panel opinions); *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 506 (6th Cir. 2021) (en banc) (Moore, J., dissenting) ("[A]fter all, a panel decision . . . does not bind the en banc court.").[8] Our merits panels cannot reconsider prior panel decisions. *See,*

---

[8]*Abrogated by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

*e.g., United States v. McKinnie*, 24 F.4th 583, 589 (6th Cir. 2022). It necessarily follows that merits panels cannot reconsider en banc decisions.

Finally, we note that even the circuits that would allow a merits panel to reconsider the denial of a COA likely would not do so here. The Third Circuit has explained that "a merits panel should 'not lightly overturn a decision made by a motions panel during the course of the same appeal.'" *Duka v. United States*, 27 F.4th 189, 196 (3d Cir. 2022) (quoting *Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 292 (3d Cir. 2007)). So, when a prisoner "present[s]…a nearly identical brief to the one they filed with the motions panel," the Third Circuit will not expand the COA. *Id.* As in *Duka*, Randolph's brief on the merits is substantively identical to his petition for rehearing en banc. Without any materially new argument explaining why the court was wrong to deny the COA the first four times, we see no reason why we should revisit that conclusion now.

\*              \*              \*

We therefore hold that a merits panel of this court lacks the authority to expand a COA beyond what was granted by the motions panel and deny Randolph's request to expand the COA.

## III. Analysis

We now turn to the merits. We conclude that the state court's rulings on the *Katz* theory were reasonable as a matter of fact and law and affirm the district court.

### A. Standard of Review

We review the district court's factual findings for clear error and its legal conclusions de novo. *E.g., Cvijetinovic v. Eberlin*, 617 F.3d 833, 836 (6th Cir. 2010). Under AEDPA, we must deny the writ unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). If, however, the state court's decision was based on unreasonable factual findings, we review the state court decision de novo. *See Rice v. White*, 660 F.3d 242, 257 (6th Cir. 2011). We review the last reasoned

decision from the state courts, *see Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018); here, that is the 2019 Michigan Court of Appeals decision.

## B.  The State Court's Factual Conclusions

We start by reviewing the state court's factual findings because our conclusions about them will guide our legal analysis.  When we review the state court's factual findings under AEDPA, we ask whether they are "unreasonable…in light of the evidence presented in the State court proceeding."  § 2254(d)(2).  "In other words, state court factual findings are presumed correct and federal courts may displace them only when the findings are shown to be 'objectively unreasonable by clear and convincing evidence.'"  *Hodge v. Plappert*, 136 F.4th 648, 666 (6th Cir. 2025) (en banc) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003)).  This is "a substantially higher threshold for obtaining relief" than arguing that the state court's factual findings were "incorrect."  *Hale v. Cool*, 122 F.4th 637, 645 (6th Cir. 2024) (quoting *Shoop v. Twyford*, 596 U.S. 811, 819 (2022)) (quotation marks omitted).  A state court's factual findings are objectively unreasonable only if the prisoner's interpretation of the facts is "the *only* conclusion that can be fairly drawn" from the state court record.  *Rice v. White*, 660 F.3d 242, 254 (6th Cir. 2011).  Finally, the prisoner "must show that the unreasonable factual determination was the but-for cause of the state court's decision."  *Hale*, 122 F.4th at 645 (quoting *Rice*, 660 F.3d at 250) (quotation marks omitted).

Randolph contests two of the state court's factual determinations:

- That Randolph left Fant's house because he feared the police.  *See Randolph III*, 2019 WL 286678, at *7 ("Put in the plainest terms, defendant's argument depends on his presupposition that after beating Fant up, then fleeing from her house (and leaving his bags behind in his haste to avoid the police), it was objectively reasonable for him to expect that those bags and their contents would be left where he had placed them, undisturbed.").

- That Randolph failed to timely retrieve his belongings.  *See Randolph III*, 2019 WL 286678, at *7 ("In any event, . . . there is no evidence that he had a subjective expectation that the contents of his bags would remain private after he left them and failed, on a timely basis, to come back and retrieve them.").

We are not persuaded.  Randolph's factual conclusions may well be reasonable interpretations of the evidence, but the state court's interpretations of the evidence are just as reasonable as Randolph's, if not more so.  Additionally, the state court's factual findings were not the but-for cause of its decision.

 Start with the state court's finding that Randolph left Fant's house because he feared the police.  Randolph asserts that this factual finding is unreasonable because Randolph "left" Fant's house "*before* 911 was called" and after Randolph "promised to leave" if Fant dropped the knife.  Appellant's Brief at 35.  But Fant told her son to call 911 before Randolph left.  Thus, the prospect of being caught by the police was already in play by the time Randolph left.

To be sure, Randolph left right after Fant dropped the knife, as promised, but Randolph took the knife with him after he left.  That Randolph took the knife with him could suggest that he was preparing for a confrontation with someone.  *See District of Columbia v. Heller*, 554 U.S. 570, 584 (2008) (carrying a weapon is usually done "for a particular purpose—confrontation").

Accordingly, we disagree with Randolph that leaving out of fear of Fant is the only conclusion we can fairly draw from this record.  We therefore conclude that the state court's factual findings on this score were not unreasonable under AEDPA.

We come to the same conclusion for Randolph's contention that he timely sought to collect his belongings from Fant.  Randolph relies heavily on his repeated calls to Fant after he left to talk about retrieving his stuff, suggesting that this proved he wanted to retain control over his belongings.  But, in the next paragraph, Randolph asserts that he was Fant's co-tenant.  Under Michigan law, a co-tenant has the absolute right to enter the property at any time, *see, e.g.*, *Quinlan Inv. Co. v. Meehan Co.*, 430 N.W.2d 805, 806–07 (Mich. Ct. App. 1988) (per curiam), so there is no reason he would have needed to call Fant about retrieving the belongings.  Moreover, Randolph could have retrieved the belongings when he left or soon after—Fant was not a threat to Randolph after dropping the knife.  Given these facts, we cannot say that the state court's factual findings on this score were unreasonable.

Furthermore, the state court would have made the same decision even without these factual findings, so Randolph cannot obtain relief under § 2254(d)(2).  *See Hale*, 122 F.4th at

645.  The state court said that Randolph provided no evidence that he subjectively held the expectation of privacy that he asserts before us.  *See Randolph III*, 2019 WL 286678, at *7.  Meanwhile, the factual findings that Randolph challenges relate to the state court's determination of whether Randolph had an objectively reasonable expectation of privacy.  The *Katz* test includes both a subjective and objective prong.  *See, e.g.*, *United States v. Rogers*, 97 F.4th 1038, 1041–42 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 1424 (2025).  Because the state court would have held that Randolph did not prove that he subjectively held a reasonable expectation of privacy, it would have made the same decision anyway.

Therefore, the state court's factual findings were not unreasonable under AEDPA, so its legal conclusions are subject to AEDPA deference.[9]

## C.  The State Court's Legal Conclusions

On federal habeas review, a state court's decision to deny relief will be disturbed only if it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme court of the United States."  28 U.S.C. § 2254(d)(1).  "In this context, 'clearly established law' signifies 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'"  *Howes v. Fields*, 565 U.S. 499, 505 (2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  That means a prisoner cannot receive relief under AEDPA if "'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Rather, "[t]he state court decision must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 420 (2014)).  Finally, state court's decision "is not an unreasonable application of clearly established Federal law" if the state court "decline[s] to apply a specific

---

[9]Randolph purports to contest the state court's claim that the .38-caliber ammunition "provided an independent basis for obtaining a warrant," Appellant's Brief at 39, but the state court said no such thing.  Instead, the state court said that Randolph waived any argument that the ammunition would not have provided an independent basis for obtaining the warrant.  *See Randolph III*, 2019 WL 286678, at *6.  We therefore need not address the argument because it was not exhausted.  *See* 28 U.S.C. § 2254(b)(1)(A); *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009).

legal rule that has not been squarely established by" the Supreme Court.  *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (quotation marks omitted).

The parties extensively addressed whether the searches for the firearm and ammunition were constitutional, but that issue is not dispositive for our AEDPA review.  In arguing that the search was unconstitutional, Randolph relies entirely on our decision in *United States v. Waller*, 426 F.3d 838 (6th Cir. 2005), and a handful of other Sixth Circuit decisions.  Although his argument might have some force if we were reviewing the case de novo, we are applying AEDPA's standard of review.  And a prisoner cannot demonstrate entitlement to habeas relief simply by arguing that the state court rejected lower federal court case law.  *Johnson v. Williams*, 568 U.S. 289, 305 (2013).[10]  Instead, the state courts are required only to reasonably apply Supreme Court precedent, *see, e.g.*, *id.*; *see also Carruthers v. Mays*, 889 F.3d 273, 290 (6th Cir. 2018), and Randolph points to no Supreme Court precedent that was misapplied. Therefore, the state court's rulings are not unreasonable under AEDPA as a matter of law.

## IV.  Conclusion

We **AFFIRM** the district court's decision and **DENY** the motion to expand the COA.

---

[10] We question whether Randolph would have been able to show that his trial counsel was deficient. Although we do not need to squarely address the issue in this case, we would hesitate to call trial counsel ineffective for failing to cite *Waller* to the state courts.  Because we cannot bind the Michigan courts, they could have simply rejected *Waller*, and Randolph would be back to square one.  *See, e.g.*, *People v. Roy*, 12 N.W.3d 183, 188 (Mich. Ct. App.) (rejecting lower federal court precedent), *appeal denied*, 994 N.W.2d 265 (Mich. 2023); *Johnson v. Williams*, 568 U.S. 289, 305 (2013).  So failing to cite *Waller* probably is not constitutionally deficient.

———————————

**CONCURRENCE**

———————————

THAPAR, Circuit Judge, concurring.    Andrew Randolph murdered his girlfriend's mother by shooting into her house.  Randolph believes that his attorney should have moved to suppress the murder weapon.  He claims the weapon was the fruit of an unlawful search that occurred two months before its discovery.  Those two months severed any causal link between the first search and the second.  Thus, while I agree with the majority's thoughtful opinion, I would decide the Fourth Amendment issue on attenuation grounds.

I.

In December 2012, Andrew Randolph lived with his girlfriend, Kanisha Fant.  They had a "very tumultuous" relationship marked by frequent arguments.  R. 6-8, Pg. ID 702.  Randolph often physically abused Fant—sometimes choking her until she almost lost consciousness.

During one marathon argument, Randolph began packing his clothes and shoes into four or five garbage bags.  The argument eventually became physical when Randolph slapped Fant across the face—in the presence of Fant's four young children.  To defend herself, Fant ran to the kitchen and grabbed a small steak knife as she begged him to "just leave me alone" and "just leave." *Id.* at 718.  But Randolph kept advancing towards her.  He punched Fant in the head and grabbed her arm, attempting to wrestle the knife out of her grip.  Randolph then placed her in a chokehold that stopped her from breathing.  Randolph commanded, "[J]ust drop the knife and I'll leave." *Id.* at 720.  Fant complied, and Randolph fled the house.  In the aftermath of this fight, Fant's family brought the bags of Randolph's belongings to the home of his father, Alphonso Taylor.

But Randolph was still itching to "do somethin[g] about" his fight with his girlfriend. R. 6-10, Pg. ID 823.  That day, he repeatedly called Fant's mother, "threaten[ing] to kill the family." *Id.* at 790–91.  Fant's mother warned a relative that "we better watch out 'cause he said he's goin' get us, he's goin' kill us, he's goin' kill us." *Id.* at 792.  And she wasn't exaggerating. That evening, Randolph went to Fant's mother's house and began shooting indiscriminately.

Tragically, one of the bullets struck Fant's mother in the neck, killing her. Police arrested Randolph at the scene but later released him.

Later that evening, police visited Taylor's house to recover Randolph's clothes and shoes. Taylor consented to a search of his home. Near the front door, officers found Randolph's "duffle [*sic*] bag, a plastic bag and some loose items." R. 6-13, Pg. ID 1107. Taylor told the officers that the clothes belonged to Randolph and that he hadn't touched them. But Taylor still allowed officers to search the items. The officers then discovered a pair of jeans that contained eight rounds of ammunition.

Almost two months later, the detective who found the ammunition in Randolph's jeans "brought the case to [the] attention" of Sergeant Bernritter, a member of the Flint Police Department who was detailed to a federal firearms taskforce. R. 6-11, Pg. ID 935–37. Bernritter was new to the case, so he studied the police file. Two facts immediately stood out: (1) Ammunition had been found among Randolph's belongings, and (2) Randolph was a convicted felon. Based on that information, Bernritter obtained a warrant to arrest Randolph for the federal crime of possessing ammunition as a felon.

Bernritter heard from a source that Randolph was staying at his brother's home. So almost two months after the shooting, Bernritter went to the brother's house and arrested Randolph.

Later that day, Bernritter discovered that Randolph's brother was on parole. The brother's parole agreement allowed police to search his home, even without a warrant. Relying on that parole agreement, Bernritter conducted a full search of the brother's home. And that's when Bernritter discovered a handgun in one of the bedroom closets.

Michigan tried Randolph for murder. At trial, the prosecution introduced the handgun that Bernritter recovered and presented expert testimony that the handgun was the murder weapon. Randolph's counsel never objected. The jury found Randolph guilty of four state-law crimes, including second-degree murder. He timely appealed, arguing—for the first time—that the murder weapon should've been suppressed and that his counsel was ineffective for failing to

object at trial.  Michigan state courts rejected that argument.  Randolph then filed a habeas petition in federal court, but the district court denied his petition.

Randolph now appeals that denial.  He contends that the search of his clothes, which led to the discovery of ammunition, was unlawful because his father didn't have the authority to consent to that search.  Randolph further asserts that absent the discovery of the bullets, the police wouldn't have had probable cause to arrest him for possessing ammunition as a convicted felon.  And because the police located the murder weapon after executing that arrest warrant, Randolph contends that his counsel should've moved to exclude the murder weapon as the fruit of an unlawful search.

## II.

Randolph must meet a "doubly" demanding standard to succeed on his ineffective-assistance claim because it arises in a habeas petition.  *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quotation omitted).

To prevail on his habeas petition, Randolph must establish that the Michigan courts' decision either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d).  Under this demanding standard, we may issue habeas relief only when "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."  *White v. Plappert*, 131 F.4th 465, 477 (6th Cir. 2025) (alteration in original) (quoting *Richter*, 562 U.S. at 102).

And to establish ineffective assistance, Randolph must show that his trial counsel's performance was deficient and that he was prejudiced by that deficiency.  *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984).  Because Randolph's theory of ineffective assistance is based on his counsel's failure to make a suppression motion, he must establish that his suppression motion would've been meritorious.  But that's not all.  The motion must be so obviously meritorious that "no competent attorney would think a motion to suppress would have failed."  *Premo v. Moore*, 562 U.S. 115, 124 (2011).

Combining these two standards, we may grant relief only if "*every* fairminded jurist would agree that *every* reasonable lawyer would have made a different decision" from Randolph's counsel when the murder weapon was introduced. *Dunn v. Reeves*, 594 U.S. 731, 740 (2021) (cleaned up).

But Randolph can't meet that high bar. The discovery of the murder weapon was far too removed from the allegedly illegal search. So the murder weapon would've been admitted, even if Randolph's attorney had objected. Since Randolph's motion to suppress would've failed, he can't show he was prejudiced.

III.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. If the government collects evidence through an unreasonable search or seizure, courts will sometimes exclude that evidence. *Herring v. United States*, 555 U.S. 135, 139 (2009). But exclusion is a "last resort," not a "first impulse." *Id.* at 140 (quotation omitted). Because excluding evidence imposes a "costly toll upon truth-seeking and law enforcement objectives," defendants seeking exclusion face a "high obstacle." *Penn. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364–65 (1998) (cleaned up).

If the costs of excluding evidence outweigh its benefits, exclusion is inappropriate. *Utah v. Strieff*, 579 U.S. 232, 235 (2016). This occurs, for example, when the causal connection between the unconstitutional conduct and the discovery of the challenged evidence is too remote. *Id.* In such cases, "the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *United States v. Leon*, 468 U.S. 897, 911 (1984) (quotation omitted).

Three factors guide an attenuation analysis. First is how close in time the unconstitutional search is to the discovery of the evidence. 579 U.S. at 239. Second is "the presence of intervening circumstances" between the search and the discovery of evidence. *Id.* at 240. And finally we look to the flagrancy of the officer's initial Fourth Amendment violation. *Id.* at 241 (quotation omitted). If the misconduct was intentional or flagrant, courts might

exclude the evidence because such police misconduct is "most in need of deterrence." *Id.* But if the officer's misconduct is merely "negligent" or the product of good-faith "errors in judgment," then the evidence should be admitted. *Id.* Here, all three factors weigh in favor of admitting the murder weapon.

Start with the gap in time between the search of Randolph's belongings and the discovery of the gun. *Two months* passed between these events. Officers searched Randolph's bags of clothes on December 10, 2012. But Sergeant Bernritter didn't even become involved in the case until late January 2013. And he didn't discover the murder weapon until February 10, 2013—two months after the shooting.

This two-month gap between the allegedly illegal search and the discovery of the challenged evidence strongly supports admissibility. We have repeatedly held as much. *See, e.g.*, *United States v. Elmore*, 18 F.4th 193, 200–01 (6th Cir. 2021) (holding that a two-month "gap between the illicit conduct and the challenged evidence's discovery weighs in favor of the evidence's admissibility"); *United States v. Gross*, 662 F.3d 393, 402 (6th Cir. 2011) (same).

In contrast, the Supreme Court has concluded that temporal proximity favored suppression only in cases where far less time elapsed. In *Strieff*, for instance, only a few "minutes" separated the challenged conduct from the discovery of the evidence. 579 U.S. at 239. And in *Brown v. Illinois*, the gap was "less than two hours." 422 U.S. 590, 604 (1975). The two months here is an eternity compared to those cases.

Next, the intervening circumstances between the search and the discovery of the challenged evidence also support attenuation. *Strieff*, 579 U.S. at 240. Even if the search of Randolph's belongings was unlawful and thus the arrest warrant was invalid, Bernritter searched Randolph's brother's home for an independent reason. As Bernritter testified, his discovery of the brother's parole status prompted his search of the residence. And that justification is disconnected from the search of Randolph's bags two months earlier. In other words, the discovery of the brother's parole status is a classic example of an intervening circumstance that broke the causal chain between the search of Randolph's bags and the discovery of the murder weapon.

Compare this case to *Strieff*.  There, a police officer detained Strieff without reasonable suspicion.  *Id.* at 236.  Everyone agreed that the stop was a Fourth Amendment violation.  *Id.* But then, during the unlawful stop, the police officer discovered a valid warrant for Strieff's arrest.  *Id.*  Pursuant to that valid warrant, the officer arrested Strieff.  *Id.* at 235.  And during a search incident to that arrest, the officer found drugs that Strieff later sought to suppress.  *Id.* at 236.  The Supreme Court explained that the discovery of the arrest warrant qualified as an intervening circumstance that supported admitting the drugs.  *Id.* at 240.  The arrest warrant was "valid," its existence "predated" the unlawful stop, and it was "entirely unconnected with" that stop.  *Id.*

So too here.  Just as the officer in *Strieff* discovered a valid arrest warrant, Bernritter discovered that Randolph's brother was on parole and that his parole agreement permitted a search of his home.  That parole agreement predated and was "entirely unconnected with" Bernritter's decision to arrest Randolph.  *Id.*  Thus, it provided an independent basis for Bernritter to search the house.  In fact, the attenuation is even clearer here than in *Strieff* because the brother freely told Bernritter that he was a parolee.  That "act of free will" further attenuates the search of the brother's residence from the search of Randolph's bags.  *Elmore*, 18 F.4th at 201 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).  In short, the presence of intervening circumstances "strongly favors the State" here.  *Strieff*, 579 U.S. at 240.

Finally, the alleged Fourth Amendment violation (searching Randolph's belongings at his father's house) was "at most negligent," not "purposeful or flagrant."  *Id.* at 241.  When officers arrived at Taylor's house on the night of the murder, they informed him that they "needed a search warrant" to search his home, unless he consented.  R. 6-13, Pg. ID 1109.  Taylor then allowed them to "search the home."  *Id.*  Only after that did the officers enter the residence and search Randolph's clothes.

To be sure, before the officers looked through Randolph's belongings, Taylor told them that the bags belonged to Randolph and that he hadn't opened them.  But nothing suggests that the officers "knew they lacked" authority to conduct that search.  *Strieff*, 579 U.S. at 243. Rather, the officers' decision to inform Taylor that they needed a warrant to search his house and

their solicitude in obtaining his consent demonstrated a consistent concern for the Fourth Amendment.

What's more, the search didn't stem from a "suspicionless fishing expedition in the hope that something would turn up." *Id.* at 242 (quotation omitted). Rather, this was a logical step in a "bona fide investigation" after officers learned that clothes and shoes belonging to Randolph—the lead suspect in the murder—were at Taylor's home. *Id.* And "there is no indication that this unlawful [search] was part of any systemic or recurrent police misconduct." *Id.*

Likewise, the search of Randolph's bags wasn't a "flagrant" violation of the Fourth Amendment. As the Supreme Court has instructed, "[f]or the violation to be flagrant, more severe police misconduct is required than the mere absence of proper" authority to conduct a search. *Id.* at 243. Here, an officer testified that Taylor *specifically allowed them* to "search . . . the property he was holding for [Randolph]." R. 6-9, Pg. ID 766. So, even if Taylor didn't have the authority to give that permission, his consent makes the resulting search less flagrant. In other words, this isn't the sort of grievous police misconduct that is "most in need of deterrence." *Strieff*, 579 U.S. at 241.

In sum, all three attenuation factors support admitting the murder weapon.

\*    \*    \*

Randolph's argument on appeal is the equivalent of a "constitutional triple bank shot." *Elmore*, 18 F.4th at 201. To justify suppression, he relies on a convoluted causal chain connecting the allegedly illegal search of his bags in Taylor's home to the ultimate discovery of the murder weapon in a separate residence two months later. Because the attenuation doctrine would've doomed any motion to suppress, Randolph wasn't prejudiced by his counsel's actions. Thus, I agree with the majority that we should affirm.

———————————

**CONCURRENCE**

———————————

MATHIS, Circuit Judge, concurring in part and concurring in the judgment.  I agree with the majority opinion that the district court did not err in denying Andrew Randolph's petition for a writ of habeas corpus.  I also agree that we should deny Randolph's motion to expand the certificate of appealability that the motions panel granted him.  But I would not, as the majority opinion does, purport to foreclose all future merits panels from expanding a certificate of appealability to additional issues when a motions panel declines to do so.

I begin by briefly recapping the procedural history of the certificate-of-appealability dispute.  When the district court denied Randolph's habeas petition, it also denied him a certificate of appealability.  Randolph then sought a certificate of appealability in this court on four issues.  After a single judge denied Randolph's request, a motions panel granted Randolph a certificate of appealability on one issue: whether his trial counsel was ineffective for failing to move to suppress evidence obtained from a search of his belongings without his consent.  That panel denied Randolph a certificate on the other three issues.  The en banc court declined to rehear Randolph's request to expand the certificate of appealability.  Still, Randolph addressed all four issues in his appellate briefing, again asking us to expand his certificate of appealability.  The warden did not respond on the merits to the uncertified claims.

We should have simply denied Randolph's request to expand his certificate of appealability because he failed to "ma[k]e a substantial showing of the denial of a constitutional right" for the uncertified claims.  28 U.S.C. § 2253(c)(2).  But the majority opinion goes further.  It concludes that a merits panel can never expand a certificate of appealability to other issues when a motions panel refuses to do so.  In my view, merits panels retain the authority to expand certificates of appealability.

AEDPA bars habeas petitioners from taking an appeal to the court of appeals "[u]nless a circuit justice or judge issues a certificate of appealability."  *Id.* § 2253(c)(1).  "The certificate of

appealability . . . shall indicate which specific issue or issues" make a substantial showing of a constitutional violation. *Id.* § 2253(c)(3).

Section 2253(c)(1) implicates our jurisdiction. We "lack jurisdiction to rule on the merits of appeals from habeas petitioners" until they have secured a certificate of appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

But "§ 2253(c)(3) is nonjurisdictional." *Gonzalez v. Thaler*, 565 U.S. 134, 143 (2012). So that provision "does not deprive us of subject-matter jurisdiction to consider issues that fall outside the certificate of appealability that we granted." *Pillow v. Burton*, 852 F. App'x 986, 991 (6th Cir. 2021). In a similar vein, the Supreme Court explained that "it would seem somewhat counterintuitive to render a panel of court of appeals judges powerless to act on appeals based on COAs that Congress specifically empowered one court of appeals judge to grant." *Gonzalez*, 565 U.S. at 143–44.

AEDPA's plain language does not prohibit us from expanding Randolph's certificate of appealability. This court has jurisdiction over Randolph's appeal because the motions panel granted him a certificate. And we can expand that certificate without creating any jurisdictional problems. *See id.* at 143–46; *Pillow*, 852 F. App'x at 991.

This court's precedent confirms that a merits panel has authority to expand a certificate of appealability. In *Kraus v. Taylor*, we granted a certificate of appealability on certain issues. 715 F.3d 589, 593 (6th Cir. 2013). The habeas petitioner then sought to expand the certificate to add another claim. *Id.* at 594. A motions panel denied the request. *Id.* Like Randolph, the *Kraus* petitioner briefed the uncertified claim and asked the merits panel to expand the certificate. The merits panel expanded it, noting that the court's interlocutory orders are "subject to revision." *Id.*[1] (quotation omitted); *see also Post v. Bradshaw*, 621 F.3d 406, 412–13 (6th Cir. 2010) (expanding the habeas petitioner's certificate of appealability after the motions panel denied that request); *cf. Howard v. United States*, 485 F. App'x 125, 127–28 (6th Cir. 2012)

---

[1]Under the majority opinion's read of *Kraus*, if a habeas petitioner untimely or improperly seeks to expand his certificate of appealability before a motions panel, then a merits panel can expand the certificate. But if the petitioner timely and properly seeks to expand his certificate before a motions panel and is unsuccessful, then a merits panel cannot expand the certificate.

(holding that this court has "inherent authority to expand sua sponte the scope of a COA to encompass additional issues briefed and addressed on the merits before the district court").

The majority opinion's contrary arguments fail.

First, the majority opinion suggests that no mechanism exists for a merits panel to reconsider a motions panel's denial of a certificate of appealability. But this court has held that "the decisions of motions panels are generally interlocutory in nature (and, thus, not strictly binding upon subsequent panels)." *Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014); *see also Kraus*, 715 F.3d at 594.

Second, the majority opinion suggests that the law-of-the case doctrine precludes us from reconsidering a motions-panel decision. That doctrine prevents this court from reconsidering issues that we "decided explicitly or implicitly by necessary inference at an earlier stage of the case." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 141 F.4th 796, 803 (6th Cir. 2025) (citation modified). "Application of the law-of-the-case doctrine has been historically limited to fully briefed questions necessarily decided in an earlier appeal, and has traditionally been used to enforce a district court's adherence to an appellate court's judgment." *Keahey v. Marquis*, 978 F.3d 474, 481 (6th Cir. 2020) (citation modified). Even when the doctrine applies, it is "not an inexorable command." *Kanuszewski*, 141 F.4th at 803 (quotation omitted). And the doctrine does not stop courts from "revisit[ing] their own rulings before final judgment." *Edmonds v. Smith*, 922 F.3d 737, 740 (6th Cir. 2019). Because motions-panel decisions are "interlocutory" and "subject to revision," *Kraus*, 715 F.3d at 594, the law-of-the-case doctrine does not apply to those decisions.

Third, the majority opinion argues that merits panels cannot overturn rulings made by the en banc court. That is true, but irrelevant. The en banc court never made a ruling on Randolph's request to expand his certificate of appealability. Instead, it simply declined to hear the request.

In the end, we have the authority to expand Randolph's certificate of appealability. I, like the majority, would deny his request. But that is all I would do. I see no reason to attempt to cabin future merits panels from reaching a different conclusion based on different facts and circumstances, particularly when the law does not support such a categorical bar. As Chief

Justice Roberts has said: "If it is not necessary to decide more to dispose of a case, then it is necessary *not* to decide more." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 348 (2022) (Roberts, C.J., concurring in the judgment).